# SCHLUP *v.* DELO, SUPERINTENDENT, POTOSI CORRECTIONAL CENTER

No. 93–7901.   Argued October 3, 1994—Decided January 23, 1995

300

STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, SOUTER, GINSBURG, and BREYER, JJ., joined. O'CONNOR, J., filed a concurring opinion, *post*, p. 332. REHNQUIST, C. J., filed a dissenting opinion, in which KENNEDY and THOMAS, JJ., joined, *post*, p. 334. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined, *post*, p. 342.

*Sean D. O'Brien* argued the cause for petitioner. With him on the briefs were *Anthony G. Amsterdam, Randy Hertz,* and *Timothy K. Ford.*

*Jeremiah W. (Jay) Nixon,* Attorney General of Missouri, argued the cause for respondent. With him on the brief were *Stephen D. Hawke* and *Frank A. Jung,* Assistant Attorneys General.*

*Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Daniel E. Lungren,* Attorney General of California, *George Williamson,* Chief Assistant Attorney General, *Dane R. Gillette,* Deputy Attorney General, and *Mark L. Krotoski,* Special Assistant Attorney General, *James H. Evans,* Attorney General of Alabama, *Bruce M. Botelho,* Attorney General of Alaska, *Grant Woods,* Attorney General of Arizona, *Gale A. Norton,* Attorney General of Colorado, *John M. Bailey,* Chief State's Attorney of Connecticut, *Charles M. Oberly III,* Attorney General of Delaware, *Robert A. Butterworth,* Attorney General of Florida, *Larry EchoHawk,* Attorney General of Idaho, *Roland W. Burris,* Attorney General of Illinois, *Chris Gorman,* Attorney General of Kentucky, *Richard P. Ieyoub,* Attorney General of Louisiana, *Mike Moore,* Attorney General of Mississippi, *Joseph P. Mazurek,* Attorney General of Montana, *Don*

Justice Stevens delivered the opinion of the Court.

Petitioner Lloyd E. Schlup, Jr., a Missouri prisoner currently under a sentence of death, filed a second federal habeas corpus petition alleging that constitutional error deprived the jury of critical evidence that would have established his innocence. The District Court, without conducting an evidentiary hearing, declined to reach the merits of the petition, holding that petitioner could not satisfy the threshold showing of "actual innocence" required by *Sawyer* v. *Whitley*, 505 U. S. 333 (1992). Under *Sawyer*, the petitioner must show "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner" guilty. *Id.*, at 336. The Court of Appeals affirmed. We granted certiorari to consider whether the *Sawyer* standard provides adequate protection against the kind of miscarriage of justice that would result from the execution of a person who is actually innocent.

I

On February 3, 1984, on Walk 1 of the high security area of the Missouri State Penitentiary, a black inmate named Arthur Dade was stabbed to death. Three white inmates from

*Stenberg*, Attorney General of Nebraska, *Frankie Sue Del Papa*, Attorney General of Nevada, *Deborah T. Poritz*, Attorney General of New Jersey, *Tom Udall*, Attorney General of New Mexico, *Michael F. Easley*, Attorney General of North Carolina, *Lee Fisher*, Attorney General of Ohio, *Susan B. Loving*, Attorney General of Oklahoma, *Ernest D. Preate, Jr.*, Attorney General of Pennsylvania, *T. Travis Medlock*, Attorney General of South Carolina, *Mark Barnett*, Attorney General of South Dakota, *Charles W. Burson*, Attorney General of Tennessee, *Dan Morales*, Attorney General of Texas, *Jan Graham*, Attorney General of Utah, *James S. Gilmore III*, Attorney General of Virginia, and *Joseph B. Meyer*, Attorney General of Wyoming; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson*.

*Harold R. Tyler, Jr.*, and *Eric M. Freedman* filed a brief of *amici curiae* for Five Innocent Former Death Row Inmates et al.

Walk 2, including petitioner, were charged in connection with Dade's murder.

At petitioner's trial in December 1985, the State's evidence consisted principally of the testimony of two corrections officers who had witnessed the killing. On the day of the murder, Sergeant Roger Flowers was on duty on Walk 1 and Walk 2, the two walks on the lower floor of the prison's high security area. Flowers testified that he first released the inmates on Walk 2 for their noon meal and relocked their cells. After unlocking the cells to release the inmates on Walk 1, Flowers noticed an inmate named Rodnie Stewart moving against the flow of traffic carrying a container of steaming liquid. Flowers watched as Stewart threw the liquid in Dade's face. According to Flowers, Schlup then jumped on Dade's back, and Robert O'Neal joined in the attack. Flowers shouted for help, entered the walk, and grabbed Stewart as the two other assailants fled.

Officer John Maylee witnessed the attack from Walk 7, which is three levels and some 40–50 feet above Walks 1 and 2.[1] Maylee first noticed Schlup, Stewart, and O'Neal as they were running from Walk 2 to Walk 1 against the flow of traffic. According to Maylee's testimony, Stewart threw a container of liquid at Dade's face, and then Schlup jumped on Dade's back. O'Neal then stabbed Dade several times in the chest, ran down the walk, and threw the weapon out a window. Maylee did not see what happened to Schlup or Stewart after the stabbing.

The State produced no physical evidence connecting Schlup to the killing, and no witness other than Flowers and Maylee testified to Schlup's involvement in the murder.[2]

---

[1] Maylee was unavailable to testify at Schlup's trial. Testimony from Maylee's pretrial deposition was admitted in evidence and was read to the jury.

[2] In contrast, the evidence of the involvement of Stewart and O'Neal in Dade's murder was substantial. Stewart, for example, was apprehended

Schlup's defense was that the State had the wrong man.[3] He relied heavily on a videotape from a camera in the prisoners' dining room. The tape showed that Schlup was the first inmate to walk into the dining room for the noon meal, and that he went through the line and got his food. Approximately 65 seconds after Schlup's entrance, several guards ran out of the dining room in apparent response to a distress call. Twenty-six seconds later, O'Neal ran into the dining room, dripping blood.[4] Shortly thereafter, Schlup and O'Neal were taken into custody.

Schlup contended that the videotape, when considered in conjunction with testimony that he had walked at a normal pace from his cell to the dining room,[5] demonstrated that he could not have participated in the assault. Because the videotape showed conclusively that Schlup was in the dining room 65 seconds before the guards responded to the distress call, a critical element of Schlup's defense was determining when the distress call went out. Had the distress call sounded shortly after the murder, Schlup would not have had time to get from the prison floor to the dining room, and

---

by Flowers during the struggle itself. And when O'Neal was taken into custody, his clothes were covered with blood and he was bleeding from lacerations on his right hand.

[3] Schlup did not testify at the guilt phase of the trial. At the sentencing hearing, Schlup did testify and maintained his innocence of the offense. He continued to maintain his innocence even after the jury had sentenced him to death.

[4] After stabbing Dade, O'Neal broke a window with his hand and threw the knife out the window. That resulted in multiple lacerations to his right hand. Before leaving the prison floor, O'Neal paused briefly at a utilities sink on Walk 2 to try to wash off the blood, and then continued on to the dining room.

O'Neal was followed into the dining room by inmate Randy Jordan, who is identified in some affidavits attesting to petitioner's innocence as the third participant in the crime. See *infra*, at 308–309. However, Jordan's name was not mentioned at Schlup's trial.

[5] Schlup's cell was at the end of Walk 2, closest to the dining room.

thus he could not have participated in the murder. Conversely, had there been a delay of several minutes between the murder and the distress call, Schlup might have had sufficient time to participate in the murder and still get to the dining room over a minute before the distress call went out.[6]

The prosecutor adduced evidence tending to establish that such a delay had in fact occurred. First, Flowers testified that none of the officers on the prison floor had radios, thus implying that neither he nor any of the other officers on the floor was able to radio for help when the stabbing occurred. Second, Flowers testified that after he shouted for help, it took him "a couple [of] minutes" to subdue Stewart.[7] Flowers then brought Stewart downstairs, encountered Captain James Eberle, and told Eberle that there had been a "disturbance."[8] Eberle testified that he went upstairs to the prison floor, and then radioed for assistance. Eberle estimated that the elapsed time from when he first saw Flowers

---

[6] A necessary element of Schlup's defense was that Flowers and Maylee were mistaken in their identification of Schlup as one of the participants in the murder. Schlup suggested that Flowers had taken a visitor to Schlup's cell just 30 minutes before the murder. Schlup argued that Flowers had therefore had Schlup "on the brain," Trial Tr. 493–494, thus explaining why, in the confusion surrounding the murder, Flowers might have mistakenly believed that he had seen Schlup.

Schlup argued that Maylee's identification was suspect because Maylee was three floors away from the murder and did not have an unobstructed view of the murder scene. Schlup further suggested that Maylee's identification of Schlup had been influenced by a postincident conversation between Maylee and another officer who had talked to Flowers.

Schlup also argued that there were inconsistencies between the description of the murder provided by Flowers and that provided by Maylee. For example, Maylee testified that he saw Schlup, Stewart, and O'Neal running together against the flow of traffic, and that the three men had stopped when they encountered Dade. See *id.*, at 332. Flowers noticed only Stewart running against the flow of traffic, and he testified that O'Neal and Schlup were at the other end of the walk on the far side of Dade. See *id.*, at 249.

[7] *Id.*, at 243.

[8] *Id.*, at 245.

until he radioed for help was "approximately a minute."[9]
The prosecution also offered testimony from a prison investi-
gator who testified that he was able to run from the scene of
the crime to the dining room in 33 seconds and to walk the
distance at a normal pace in a minute and 37 seconds.

Neither the State nor Schlup was able to present evidence
establishing the exact time of Schlup's release from his cell
on Walk 2, the exact time of the assault on Walk 1, or the
exact time of the radio distress call. Further, there was no
evidence suggesting that Schlup had hurried to the dining
room.[10]

After deliberating overnight, the jury returned a verdict
of guilty. Following the penalty phase, at which the victim
of one of Schlup's prior offenses testified extensively about
the sordid details of that offense,[11] the jury sentenced Schlup
to death. The Missouri Supreme Court affirmed Schlup's
conviction and death sentence, *State* v. *Schlup*, 724 S. W. 2d
236 (Mo. 1987), and this Court denied certiorari, *Schlup* v.
*Missouri*, 482 U. S. 920 (1987).[12]

---

[9] *Id.*, at 212, 214–215.

[10] In fact, the evidence presented was to the contrary. Two inmates,
Bernard Bailey and Arthur St. Peter, testified that they were behind
Schlup in line on the way to the dining room and that they had all walked
at a normal pace. Lieutenant Robert Faherty, the corrections officer on
duty in the corridor leading from the prison floor to the dining room, testi-
fied that Schlup was the first inmate into the corridor on the day of the
murder. Faherty also testified that he saw Schlup pause and yell some-
thing out one of the windows in the corridor, and that he told Schlup to
move on. Faherty testified that nothing else unusual had occurred while
Schlup was in the corridor.

On the other hand, both Maylee's testimony and the videotape establish
that O'Neal ran from Walk 1 to the dining room.

[11] Schlup had been convicted of sodomy and assault in connection with
a series of attacks on a cellmate while he was being held in a county jail.

[12] The other alleged participants in the crime were convicted in earlier,
separate trials. O'Neal, who did the stabbing, was sentenced to death,
see *State* v. *O'Neal*, 718 S. W. 2d 498 (Mo. 1986); Stewart, who was appre-
hended by Flowers at the scene, was sentenced to 50 years' imprisonment

## II

On January 5, 1989, after exhausting his state collateral remedies,[13] Schlup filed a *pro se* petition for a federal writ of habeas corpus, asserting the claim, among others, that his trial counsel was ineffective for failing to interview and to call witnesses who could establish Schlup's innocence.[14] The District Court concluded that Schlup's ineffectiveness claim was procedurally barred, and it denied relief on that claim without conducting an evidentiary hearing.[15] The Court of Appeals affirmed, though it did not rely on the alleged procedural bar. *Schlup* v. *Armontrout,* 941 F. 2d 631 (CA8 1991). Instead, based on its own examination of the record, the Court found that trial counsel's performance had not been constitutionally ineffective, both because counsel had reviewed statements that Schlup's potential witnesses had given to prison investigators, and because the testimony of those witnesses "would be repetitive of the testimony to be presented at trial." *Id.,* at 639.[16] But cf. 11 F. 3d 738, 746,

without eligibility for probation or parole, see *State* v. *Stewart,* 714 S. W. 2d 724 (Mo. App. 1986).

[13] The denial of Schlup's motion for postconviction relief was affirmed by the Missouri Supreme Court on October 18, 1988. See *Schlup* v. *State,* 758 S. W. 2d 715 (Mo. 1988).

[14] Schlup identified three nonparticipant witnesses who he claimed had witnessed the murder: Van Robinson, Lamont Griffin Bey, and Ricky McCoy. Schlup also faulted trial counsel for failing to interview Randy Jordan, whom Schlup identified as the third participant in the murder.

[15] Schlup had presented the ineffectiveness claim in his state postconviction motion, but had failed to raise it on appeal. See *Schlup* v. *Armontrout,* No. 89–0020C(3), 1989 U. S. Dist. LEXIS 18285, *11–*13 (ED Mo., May 31, 1989).

Schlup's first federal habeas petition also raised several other claims, all of which were denied either as procedurally barred or on the merits.

[16] The Court of Appeals also addressed Schlup's other claims. Over Judge Heaney's dissent, the court rejected Schlup's claim that his counsel had been ineffective for failing to adduce available mitigating evidence at the penalty hearing. *Schlup* v. *Armontrout,* 941 F. 2d, at 639. The court

n. 3 (CA8 1993) (Heaney, J., dissenting) (challenging the conclusion that such testimony would have been "repetitive"). The Court of Appeals denied a petition for rehearing and suggestion for rehearing en banc, *Schlup* v. *Armontrout*, 945 F. 2d 1062 (1991), and we denied a petition for certiorari, 503 U. S. 909 (1992).

On March 11, 1992, represented by new counsel, Schlup filed a second federal habeas corpus petition. That petition raised a number of claims, including that (1) Schlup was actually innocent of Dade's murder, and that his execution would therefore violate the Eighth and Fourteenth Amendments, cf. *Herrera* v. *Collins,* 506 U. S. 390 (1993); (2) trial counsel was ineffective for failing to interview alibi witnesses; and (3) the State had failed to disclose critical exculpatory evidence. The petition was supported by numerous affidavits from inmates attesting to Schlup's innocence.

The State filed a response arguing that various procedural bars precluded the District Court from reaching the merits of Schlup's claims and that the claims were in any event meritless. Attached to the State's response were transcripts of inmate interviews conducted by prison investigators just five days after the murder. One of the transcripts contained an interview with John Green, an inmate who at the time was the clerk for the housing unit. In his interview, Green stated that he had been in his office at the end of the walks when the murder occurred. Green stated that Flowers had

---

also rejected Schlup's separate claim challenging the denial of his request for an evidentiary hearing in the District Court. Schlup had requested such a hearing to develop evidence so that he could in turn challenge the failure of the state court to grant his request for a continuance of his state postconviction proceedings. Schlup had requested that continuance to obtain additional evidence to support his claim of innocence. The Court of Appeals held that Schlup's challenge to the state court's failure to grant a continuance was not cognizable in a federal habeas corpus action. *Id.,* at 642.

told him to call for help, and that Green had notified base of the disturbance shortly after it began.[17]

Schlup immediately filed a traverse arguing that Green's affidavit provided conclusive proof of Schlup's innocence. Schlup contended that Green's statement demonstrated that a call for help had gone out shortly after the incident. Because the videotape showed that Schlup was in the dining room some 65 seconds before the guards received the distress call, Schlup argued that he could not have been involved in Dade's murder. Schlup emphasized that Green's statement was not likely to have been fabricated, because at the time of Green's interview, neither he nor anyone else would have realized the significance of Green's call to base. Schlup tried to buttress his claim of innocence with affidavits from inmates who stated that they had witnessed the event and that Schlup had not been present.[18] Two of those affi-

---

[17] "BROOKS: John, whenever you saw Dade fall what did you do then?

"GREEN: I stepped out of the office and I heard Sgt. Flowers calling for officers cause they had had a fight. Couldn't get nobody so he told me to call base to notify them of the fight and that's what I did.

"DEARIXON: That's all I have, John. Thank you very much." Response to Order To Show Cause Why a Writ of Habeas Corpus Should Not Be Granted, Exhibit T (Transcripts of Inmate Interviews), p. 31.

If the total time required for Green to respond to Flowers' instruction and for the base to send out a distress call in response to Green's call amounted to a mere 15–17 seconds, O'Neal running at top speed would have had 8–10 seconds to wash his hands and still would have been able to arrive in the dining room some 26 seconds after the distress call.

[18] In the District Court, Schlup attempted to supplement the record with several detailed affidavits from inmates attesting to his innocence. For example, Lamont Griffin Bey, a black inmate, submitted an affidavit in which he stated: "The first thing I saw of the fight was Rodney [sic] Stewart throw liquid in Arthur Dade's face, and O'Neal stab him. . . . I knew Lloyd Schlup at that time, but we were not friends. Lloyd Schlup was not present at the scene of the fight." Affidavit of Lamont Griffin Bey, pp. 2–3 (Apr. 7, 1993). Griffin Bey also stated: "When this happened, there was a lot of racial tension in the prison. . . . I would not stick my neck out to help a white person under these circumstances normally, but

davits suggested that Randy Jordan—who occupied the cell between O'Neal and Stewart in Walk 2, and who, as noted above, see n. 4, *supra*, is shown on the videotape arriving at lunch with O'Neal—was the third assailant.

On August 23, 1993, without holding a hearing, the District Court dismissed Schlup's second habeas petition and vacated the stay of execution that was then in effect. The District Court concluded that Schlup's various filings did not provide adequate cause for failing to raise his new claims more promptly. Moreover, the court concluded that Schlup had failed to meet the *Sawyer* v. *Whitley*, 505 U. S. 333 (1992), standard for showing that a refusal to entertain those claims would result in a fundamental miscarriage of justice. In its discussion of the evidence, the court made no separate comment on the significance of Green's statement.[19]

On September 7, 1993, petitioner filed a motion to set aside the order of dismissal, again calling the court's attention to

---

I am willing to testify because I know Lloyd Schlup is innocent." *Id.*, at 4.

Similarly, inmate Donnell White swore an affidavit in which he stated: "Three white guys were coming the opposite way. One of them had a tumbler of something that he threw in [Dade's] face. One or two of the other ones started sticking [Dade] with an ice-pick-type knife." Affidavit of Donnell White, at 1 (Apr. 21, 1993). White further stated: "I have seen Lloyd Schlup, and I know who he is. He is definitely not one of the guys I saw jump Arthur Dade . . . . I know that one of the three men involved has never been prosecuted, and I know that Lloyd Schlup is innocent. I barely know Lloyd Schlup, and I have no reason to lie for him. I told the investigators that I didn't see anything because I didn't want to get involved." *Id.*, at 3.

Though the District Court ultimately denied Schlup's motion to supplement the record, the inmate affidavits are part of the record on appeal.

[19] The District Court focused primarily on the "suspect" nature of affidavits that are produced after a long delay, cf. *Herrera* v. *Collins*, 506 U. S. 390, 423–424 (1993) (O'CONNOR, J., concurring), and that come from inmates. The court concluded that the affidavits presented by Schlup, when considered against the positive identifications made by Flowers and Maylee, failed to constitute a sufficiently persuasive showing of actual innocence. App. 79.

Green's statement. Two days later, Schlup filed a supplemental motion stating that his counsel had located John Green[20] and had obtained an affidavit from him. That affidavit confirmed Green's postincident statement that he had called base shortly after the assault. Green's affidavit also identified Jordan rather than Schlup as the third assailant.[21]

---

[20] Green had been released from prison on January 29, 1986. Green Affidavit, at 4 (Sept. 7, 1993).

[21] Green's affidavit stated:

"I looked down one walk, and I saw Randy Jordan holding Arthur Dade. Jordan was standing behind Dade, and had Dade's arms pinned to his sides from behind. I saw Robert O'Neal stab Dade several times in the chest while Jordan was holding him.

"Dade broke loose and ran straight toward me. I saw him collide with Rodnie Stewart and fall to the ground near the paint storage area. Sergeant Flowers hollered for help. I think there was so much noise that he didn't think the other guards in the Housing Unit heard him, so he told me to call base. He was on his way to break up the fight when he told me to call base. I immediately went into the office, picked up the phone, and called base.

"A sergeant at the base picked up the phone. I told him there was a fight in Housing Unit 5A. He said something like, 'OK,' and I hung up the phone." *Id.*, at 2–3.

Green stated that his call to base came "within seconds of Dade hitting the ground. It could not have been more than a half minute or a minute after he was stabbed by Jordan and O'Neal. It happened very fast." *Id.*, at 4.

Green also explained why he had earlier denied witnessing the murder: "I told [investigators] I didn't [see the murder] because I was concerned about my safety. I know that Jordan and O'Neal were in the Aryan Brotherhood, and if I said I saw them do it, they could easily have me killed." *Id.*, at 3–4.

Green continued: "If I had been contacted before Schlup's trial, I would have told his attorney that he was not there when Dade was stabbed, and I would have testified that I called base within seconds after Dade hit the ground. I might have been reluctant to snitch on Jordan and O'Neal. I'm not afraid now because I haven't been in prison for more than 7¹/2 years, and I have been working steadily ever since. I have no intention of going back to prison." *Id.*, at 6.

The District Court denied the motion and the supplemental motion without opinion.

Petitioner then sought from the Court of Appeals a stay of execution pending the resolution of his appeal. Relying on Justice Powell's plurality opinion in *Kuhlmann* v. *Wilson*, 477 U. S. 436 (1986), Schlup argued that the District Court should have entertained his second habeas corpus petition, because he had supplemented his constitutional claim "with a colorable claim of factual innocence." *Id.*, at 454.

On October 15, 1993, the Court of Appeals denied the stay application. In an opinion that was subsequently vacated, the majority held that petitioner's claim of innocence was governed by the standard announced in *Sawyer* v. *Whitley*, 505 U. S. 333 (1992), and it concluded that under that standard, the evidence of Schlup's guilt that had been adduced at trial foreclosed consideration of petitioner's current constitutional claims.[22]

Judge Heaney dissented. Relying on Green's affidavit, the videotape, and the affidavits of four other eyewitnesses, Judge Heaney concluded that the petitioner had met both the *Kuhlmann* standard and a proper reading of the *Sawyer* standard.[23] Cf. *infra*, at 331. He believed that the District Court should have conducted an evidentiary hearing in which the affiants would have been subjected to examination by the State so "their credibility could be accurately determined."[24]

In the meantime, petitioner's counsel obtained an affidavit from Robert Faherty, the former lieutenant at the prison whom Schlup had passed on the way to lunch on the day of the murder and who had reprimanded Schlup for shouting out the window. See n. 10, *supra.* Faherty's affidavit stated that Schlup had been in Faherty's presence for at least

---

[22] *Schlup* v. *Delo*, No. 93–3272, 1993 WL 409815, *3 (CA8, Oct. 15, 1993).

[23] *Id.*, at *7.

[24] *Id.*, at *5.

two and a half minutes; that Schlup was walking at a leisurely pace; and that Schlup "was not perspiring or breathing hard, and he was not nervous." Affidavit of Robert Faherty ¶¶ 4, 6 (Oct. 26, 1993).[25]

On November 15, 1993, the Court of Appeals vacated its earlier opinion and substituted a more comprehensive analysis of the law to support its decision to deny Schlup's request for a stay. 11 F. 3d 738. The majority adhered to its earlier conclusion that *Sawyer* stated the appropriate standard for evaluating Schlup's claim of actual innocence. 11 F. 3d, at 740. The opinion also contained an extended discussion of Schlup's new evidence. The court noted in particular that Green's new affidavit was inconsistent in part with both his prison interview and his testimony at the Stewart trial. *Id.,* at 742. The court viewed Faherty's affidavit as simply "an effort to embellish and expand upon his testimony" and concluded "that a habeas court should not permit retrial on such a basis." *Id.,* at 743.

Judge Heaney again dissented, concluding that Schlup had "presented truly persuasive evidence that he is actually innocent," and that the District Court should therefore have addressed the merits of Schlup's constitutional claims. *Id.,* at 744. Judge Heaney also argued that Schlup's ineffectiveness claim was substantial. He noted that Schlup's trial counsel failed to conduct individual interviews with Griffin Bey, McCoy, or any of the other inmates who told investigators that they had seen the killing. Moreover, counsel failed to interview Green about his statement that he had called

---

[25] Faherty had testified at Schlup's trial, but he had not been asked about the significant details of his encounter with Schlup that are recited in his affidavit. Faherty Affidavit ¶ 9 (Oct. 26, 1993). Faherty left the Department of Corrections in 1989. He stated in his affidavit that he had been prompted to come forward after hearing about Schlup's case through an article in the local newspaper. *Id.,* ¶ 11.

base. In fact, counsel apparently failed to conduct individual interviews with any of the potential witnesses to the crime.

Judge Heaney adhered to his conclusion that Schlup's counsel was ineffective, even though counsel allegedly had reviewed 100 interviews conducted by prison investigators.[26] Judge Heaney argued that counsel's review of the interview transcripts—rather than demonstrating counsel's effectiveness—made counsel's failure to conduct his own interviews with Green and the few inmates who admitted seeing the attack even more troubling. See *id.*, at 747, n. 5. Judge Heaney concluded that Schlup's case should be remanded to the District Court to conduct an evidentiary hearing and, if appropriate, to address the merits of Schlup's constitutional claims.

On November 17, 1993, the Court of Appeals denied a suggestion for rehearing en banc. Dissenting from that denial, three judges joined an opinion describing the question whether the majority should have applied the standard announced in *Sawyer* v. *Whitley, supra,* rather than the *Kuhlmann* standard as "a question of great importance in habeas corpus jurisprudence." 11 F. 3d, at 755. We granted certiorari to consider that question. 511 U. S. 1003 (1994).[27]

### III

As a preliminary matter, it is important to explain the difference between Schlup's claim of actual innocence and the

---

[26] The transcripts of the individual interviews conducted by the prison investigators were relatively brief: The entire written transcript of the investigators' interview with Green, for example, takes up less than one page. The vast majority of the interviews consisted of simple statements that the interviewee had not seen Dade's killing.

[27] Though the Court of Appeals denied Schlup's motion for a stay of execution, the Governor of Missouri granted a stay one day before Schlup's execution date. The Governor then ordered a Board of Inquiry to conduct clemency proceedings. Those proceedings are apparently continuing.

claim of actual innocence asserted in *Herrera* v. *Collins,* 506 U. S. 390 (1993). In *Herrera,* the petitioner advanced his claim of innocence to support a novel substantive constitutional claim, namely, that the execution of an innocent person would violate the Eighth Amendment.[28] Under petitioner's theory in *Herrera,* even if the proceedings that had resulted in his conviction and sentence were entirely fair and error free, his innocence would render his execution a "constitutionally intolerable event." *Id.,* at 419 (O'CONNOR, J., concurring).

Schlup's claim of innocence, on the other hand, is procedural, rather than substantive. His constitutional claims are based not on his innocence, but rather on his contention that the ineffectiveness of his counsel, see *Strickland* v. *Washington,* 466 U. S. 668 (1984), and the withholding of evidence by the prosecution, see *Brady* v. *Maryland,* 373 U. S. 83 (1963), denied him the full panoply of protections afforded to criminal defendants by the Constitution. Schlup, however, faces procedural obstacles that he must overcome before a federal court may address the merits of those constitutional claims. Because Schlup has been unable to establish "cause and prejudice" sufficient to excuse his failure to present his evidence in support of his first federal petition, see *McCleskey* v. *Zant,* 499 U. S. 467, 493–494 (1991),[29] Schlup may obtain review of his constitutional claims only if he falls

---

[28] In *Herrera,* we assumed for the sake of argument that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." 506 U. S., at 417.

[29] Schlup argued in the District Court that the lack of diligence of his appointed postconviction counsel, coupled with problems created by the State, established cause and prejudice. See App. 38–43 (state postconviction proceedings); *id.,* at 43–45 (proceedings on first federal habeas). That argument was rejected by the District Court and the Court of Appeals, and petitioner does not renew it in this Court.

within the "narrow class of cases . . . implicating a fundamental miscarriage of justice," *id.*, at 494. Schlup's claim of innocence is offered only to bring him within this "narrow class of cases."

Schlup's claim thus differs in at least two important ways from that presented in *Herrera.* First, Schlup's claim of innocence does not by itself provide a basis for relief. Instead, his claim for relief depends critically on the validity of his *Strickland* and *Brady* claims.[30] Schlup's claim of innocence is thus "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera,* 506 U. S., at 404; see also 11 F. 3d, at 740.[31]

More importantly, a court's assumptions about the validity of the proceedings that resulted in conviction are fundamentally different in Schlup's case than in Herrera's. In *Herrera,* petitioner's claim was evaluated on the assumption that the trial that resulted in his conviction had been error free. In such a case, when a petitioner has been "tried before a jury of his peers, with the full panoply of protections that our Constitution affords criminal defendants," 506 U. S., at 419 (O'CONNOR, J., concurring), it is appropriate to apply an

---

[30] In light of our conclusion that the courts below applied the wrong standard in evaluating Schlup's gateway innocence claim, see *infra,* at 326–327, we need not express a view concerning the merits of Schlup's underlying constitutional claims.

[31] In his submissions to the federal courts, Schlup has consistently argued that his execution would violate the Eighth and Fourteenth Amendments because he is actually innocent. That *Herrera* claim was rejected in the District Court and in the Court of Appeals. In the dissent from the denial of rehearing en banc, three judges stated that they were persuaded by Judge Heaney's dissent that there was "at least a substantial likelihood" that Schlup could meet even the extraordinarily high showing required by *Herrera.* We denied certiorari on Schlup's *Herrera* claim, and accordingly we express no opinion as to its merits.

"'extraordinarily high'" standard of review, *id.*, at 426 (O'CONNOR, J., concurring).[32]

Schlup, in contrast, accompanies his claim of innocence with an assertion of constitutional error at trial. For that reason, Schlup's conviction may not be entitled to the same degree of respect as one, such as Herrera's, that is the product of an error-free trial. Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim. However, if a petitioner such as Schlup presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.

Consequently, Schlup's evidence of innocence need carry less of a burden. In *Herrera* (on the assumption that petitioner's claim was, in principle, legally well founded), the evidence of innocence would have had to be strong enough to make his execution "constitutionally intolerable" *even if* his conviction was the product of a fair trial. For Schlup, the evidence must establish sufficient doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice *unless* his conviction was the product of a fair trial.

Our rather full statement of the facts illustrates the foregoing distinction between a substantive *Herrera* claim and Schlup's procedural claim. Three items of evidence are particularly relevant: the affidavit of black inmates attesting to the innocence of a white defendant in a racially motivated killing; the affidavit of Green describing his prompt call for

---

[32] In *Herrera*, it was not necessary to determine the appropriate standard of review because petitioner had failed to make "a truly persuasive demonstration of 'actual innocence'" under any reasonable standard.

assistance; and the affidavit of Lieutenant Faherty describing Schlup's unhurried walk to the dining room. If there were no question about the fairness of the criminal trial, a *Herrera*-type claim would have to fail unless the federal habeas court is itself convinced that those new facts unquestionably establish Schlup's innocence. On the other hand, if the habeas court were merely convinced that those new facts raised sufficient doubt about Schlup's guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error, Schlup's threshold showing of innocence would justify a review of the merits of the constitutional claims.

## IV

As this Court has repeatedly noted, "[a]t common law, res judicata did not attach to a court's denial of habeas relief." *McCleskey*, 499 U. S., at 479. Instead, "'a renewed application could be made to every other judge or court in the realm, and each court or judge was bound to consider the question of the prisoner's right to a discharge independently, and not to be influenced by the previous decisions refusing discharge.'" *Ibid.*, quoting W. Church, Writ of Habeas Corpus § 386, p. 570 (2d ed. 1893).

The Court has explained the early tolerance of successive petitions, in part, by the fact that the writ originally performed only the narrow function of testing either the jurisdiction of the sentencing court or the legality of Executive detention. See *McCleskey*, 499 U. S., at 478; *Wainwright* v. *Sykes*, 433 U. S. 72, 78 (1977).[33] The scope of the writ later expanded beyond its original narrow purview to encompass

---

[33] As this Court noted in *Wainwright* v. *Sykes*, there have been "divergent discussions of the historic role of federal habeas corpus." 433 U. S., at 77, n. 6. One recent commentator has offered a new perspective on the history of the writ. See Liebman, Apocalypse Next Time?: The Anachronistic Attack on Habeas Corpus/Direct Review Parity, 92 Colum. L. Rev. 1997 (1992).

review of constitutional error that had occurred in the proceedings leading to conviction. See *McCleskey*, 499 U. S., at 478–479; *Wainwright* v. *Sykes*, 433 U. S., at 79. That broadening of the scope of the writ created the risk that repetitious filings by individual petitioners might adversely affect the administration of justice in the federal courts. Such filings also posed a threat to the finality of state-court judgments and to principles of comity and federalism. See, *e. g.*, *McCleskey*, 499 U. S., at 491; *Murray* v. *Carrier*, 477 U. S. 478, 487 (1986).

To alleviate the increasing burdens on the federal courts and to contain the threat to finality and comity, Congress attempted to fashion rules disfavoring claims raised in second and subsequent petitions. For example, in 1966, Congress amended 28 U. S. C. § 2244(b) "to introduce 'a greater degree of finality of judgments in habeas corpus proceedings.'" *Kuhlmann* v. *Wilson*, 477 U. S., at 450, quoting S. Rep. No. 1797, 89th Cong., 2d Sess., 2 (1966) (Senate Report); see also *McCleskey*, 499 U. S., at 486. Similarly, in 1976, Congress promulgated Rule 9(b) of the Rules Governing Habeas Corpus Proceedings in part to deal with the problem of repetitive filings.

These same concerns resulted in a number of recent decisions from this Court that delineate the circumstances under which a district court may consider claims raised in a second or subsequent habeas petition. In those decisions, the Court held that a habeas court may not ordinarily reach the merits of successive claims, *Kuhlmann* v. *Wilson*, 477 U. S. 436 (1986), or abusive claims, *McCleskey*, 499 U. S., at 493, absent a showing of cause and prejudice, see *Wainwright* v. *Sykes*, 433 U. S. 72 (1977).[34] The application of cause and

---

[34] A "'successive petition' raises grounds identical to those raised and rejected on the merits on a prior petition." *Kuhlmann* v. *Wilson*, 477 U. S., at 444, n. 6 (plurality opinion). An "abusive petition" occurs "where a prisoner files a petition raising grounds that were available but not relied upon in a prior petition, or engages in other conduct that 'disentitle[s] him

prejudice to successive and abusive claims conformed to this Court's treatment of procedurally defaulted claims. *Carrier*, 477 U. S. 478; see also *McCleskey*, 499 U. S., at 490–491 ("The doctrines of procedural default and abuse of the writ implicate nearly identical concerns flowing from the significant costs of federal habeas corpus review"). See generally *Sawyer*, 505 U. S., at 338–340. The net result of this congressional and judicial action has been the adoption in habeas corpus of a " 'qualified application of the doctrine of res judicata.' " *McCleskey*, 499 U. S., at 486, quoting Senate Report, at 2.[35]

At the same time, the Court has adhered to the principle that habeas corpus is, at its core, an equitable remedy. This Court has consistently relied on the equitable nature of habeas corpus to preclude application of strict rules of res judicata. Thus, for example, in *Sanders* v. *United States*, 373 U. S. 1 (1963), this Court held that a habeas court must adjudicate even a successive habeas claim when required to do so by the "ends of justice." *Id.*, at 15–17; see also *McCleskey*, 499 U. S., at 495. The *Sanders* Court applied this equitable exception even to petitions brought under 28

---

to the relief he seeks.' " *Ibid.*, quoting *Sanders* v. *United States*, 373 U. S. 1, 17–19 (1963).

[35] This Court has repeatedly noted the interplay between statutory language and judicially managed equitable considerations in the development of habeas corpus jurisprudence. For example, in *McCleskey*, the Court noted that the doctrine of abuse of the writ of habeas corpus "refers to a complex and evolving body of equitable principles informed and controlled by historical usage, statutory developments, and judicial decisions." 499 U. S., at 489. Similarly, in *Wainwright* v. *Sykes*, the Court noted its "historic willingness to overturn or modify its earlier views of the scope of the writ, even where the statutory language authorizing judicial action has remained unchanged." 433 U. S., at 81; see also *Kuhlmann*, 477 U. S., at 446–447 (explaining that the Court has both expanded and limited the scope of the writ); *Brecht* v. *Abrahamson*, 507 U. S. 619, 633 (1993) ("We have filled the gaps of the habeas corpus statute with respect to other matters").

U. S. C. § 2255, though the language of § 2255 contained no reference to an "ends of justice" inquiry. 373 U. S., at 12–15.

We firmly established the importance of the equitable inquiry required by the ends of justice in "a trio of 1986 decisions" handed down on the same day. *Sawyer*, 505 U. S., at 339 (referring to *Kuhlmann* v. *Wilson*, 477 U. S. 436, *Murray* v. *Carrier*, 477 U. S. 478, and *Smith* v. *Murray*, 477 U. S. 527). In *Kuhlmann*, seven Members of this Court squarely rejected the argument that in light of the 1966 amendments, "federal courts no longer must consider the 'ends of justice' before dismissing a successive petition." 477 U. S., at 451 (plurality opinion); *id.*, at 468–471 (Brennan, J., dissenting); *id.*, at 476–477 (STEVENS, J., dissenting); see also *Sawyer*, 505 U. S., at 339 (noting that in *Kuhlmann*, "[w]e held that despite the removal of [the reference to the ends of justice] from 28 U. S. C. § 2244(b) in 1966, the miscarriage of justice exception would allow successive claims to be heard"). Thus, while recognizing that successive petitions are generally precluded from review, Justice Powell's plurality opinion expressly noted that there are "limited circumstances under which the interests of the prisoner in relitigating constitutional claims held meritless on a prior petition may outweigh the countervailing interests served by according finality to the prior judgment." 477 U. S., at 452. Similarly, writing for the Court in *Carrier*, JUSTICE O'CONNOR observed that the Court had adopted the cause and prejudice standard in part because of its confidence that that standard would provide adequate protection to "'victims of a fundamental miscarriage of justice,'" 477 U. S., at 495–496, quoting *Engle* v. *Isaac*, 456 U. S. 107, 135 (1982); however, JUSTICE O'CONNOR also noted that the Court has candidly refused to "pretend that this will always be true," *Carrier*, 477 U. S., at 496. For that reason, "'[i]n appropriate cases,' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a funda-

mentally unjust incarceration.'" *Id.*, at 495, quoting *Engle* v. *Isaac,* 456 U. S., at 135; see also *Smith* v. *Murray,* 477 U. S., at 537. In subsequent cases, we have consistently reaffirmed the existence and importance of the exception for fundamental miscarriages of justice. See, *e. g., Sawyer,* 505 U. S., at 339–340; *McCleskey,* 499 U. S., at 494–495; *Dugger* v. *Adams,* 489 U. S. 401, 414 (1989) (Blackmun, J., dissenting).

To ensure that the fundamental miscarriage of justice exception would remain "rare" and would only be applied in the "extraordinary case," while at the same time ensuring that the exception would extend relief to those who were truly deserving, this Court explicitly tied the miscarriage of justice exception to the petitioner's innocence. In *Kuhlmann,* for example, Justice Powell concluded that a prisoner retains an overriding "interest in obtaining his release from custody if he is innocent of the charge for which he was incarcerated. That interest does not extend, however, to prisoners whose guilt is conceded or plain." 477 U. S., at 452. Similarly, JUSTICE O'CONNOR wrote in *Carrier* that "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." 477 U. S., at 496; see also *Smith* v. *Murray,* 477 U. S., at 537, quoting *Carrier,* 477 U. S., at 496.

The general rule announced in *Kuhlmann, Carrier,* and *Smith,* and confirmed in this Court's more recent decisions, rests in part on the fact that habeas corpus petitions that advance a substantial claim of actual innocence are extremely rare.[36] Judge Friendly's observation a quarter of a

---

[36] Indeed, neither party called our attention to any decision from a Court of Appeals in which a petitioner had satisfied any definition of actual innocence. Though some such decisions exist, see, *e. g., Henderson* v. *Sargent,* 926 F. 2d 706, 713–714 (CA8), reaff'd in relevant part on rehearing, 939 F. 2d 586 (CA8 1991), cert. denied, 502 U. S. 1050 (1992); *Bliss* v. *Lockhart,*

century ago that "the one thing almost never suggested on collateral attack is that the prisoner was innocent of the crime" remains largely true today.[37]  Explicitly tying the miscarriage of justice exception to innocence thus accommodates both the systemic interests in finality, comity, and conservation of judicial resources, and the overriding individual interest in doing justice in the "extraordinary case," *Carrier*, 477 U. S., at 496.

In addition to linking miscarriages of justice to innocence, *Carrier* and *Kuhlmann* also expressed the standard of proof that should govern consideration of those claims.  In *Carrier*, for example, the Court stated that the petitioner must show that the constitutional error "probably" resulted in the conviction of one who was actually innocent.  The *Kuhlmann* plurality, though using the term "colorable claim of factual innocence," elaborated that the petitioner would be required to establish, by a "'fair probability,'" that "'the trier of the facts would have entertained a reasonable doubt of his guilt.'"  477 U. S., at 454, 455, n. 17.

In the years following *Kuhlmann* and *Carrier*, we did not expound further on the actual innocence exception.  In those few cases that mentioned the standard, the Court continued to rely on the formulations set forth in *Kuhlmann* and *Carrier*.  In *McCleskey*, for example, while establishing that cause and prejudice would generally define the situations in which a federal court might entertain an abusive petition, the Court recognized an exception for cases in which the constitutional violation "probably has caused the conviction of one innocent of the crime."  499 U. S., at 494, citing *Carrier*, 477 U. S., at 485.

---

891 F. 2d 1335, 1342 (CA8 1987) (relying on *Carrier*'s actual innocence exception as an alternative ground of decision), independent research confirms that such decisions are rare.

[37] Friendly, Is Innocence Irrelevant?  Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 145 (1970).

Then, in *Sawyer,* the Court examined the miscarriage of justice exception as applied to a petitioner who claimed he was "actually innocent of the death penalty." In that opinion, the Court struggled to define "actual innocence" in the context of a petitioner's claim that his death sentence was inappropriate. The Court concluded that such actual innocence "must focus on those elements which render a defendant eligible for the death penalty." 505 U. S., at 347. However, in addition to defining what it means to be "innocent" of the death penalty, the Court departed from *Carrier's* use of "probably" and adopted a more exacting standard of proof to govern these claims: The Court held that a habeas petitioner "must show by *clear and convincing* evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." 505 U. S., at 336 (emphasis added).[38] No attempt was made in *Sawyer* to reconcile this stricter standard with *Carrier's* use of."probably."

## V

In evaluating Schlup's claim of innocence, the Court of Appeals applied Eighth Circuit precedent holding that *Sawyer,* rather than *Carrier,* supplied the proper legal standard. The court then purported to apply the *Sawyer* standard. Schlup argues that *Sawyer* has no application to a petitioner who claims that he is actually innocent of the crime, and that the Court of Appeals misapplied *Sawyer* in any event. Respondent contends that the Court of Appeals was correct in both its selection and its application of the *Sawyer* standard. Though the Court of Appeals seems to have misapplied *Sawyer,*[39] we do not rest our decision on that ground because we

---

[38] Even the high standard of proof set forth in *Sawyer* falls short of the *Jackson* standard governing habeas review of claims of insufficiency of the evidence. See *Jackson* v. *Virginia,* 443 U. S. 307, 324 (1979) ("[N]o rational trier of fact *could* have found proof of guilt beyond a reasonable doubt") (emphasis added). See *infra,* at 330.

[39] See *infra,* at 331.

conclude that in a case such as this, the *Sawyer* standard does not apply.

As we have stated, the fundamental miscarriage of justice exception seeks to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case. We conclude that *Carrier*, rather than *Sawyer*, properly strikes that balance when the claimed injustice is that constitutional error has resulted in the conviction of one who is actually innocent of the crime.

Claims of actual innocence pose less of a threat to scarce judicial resources and to principles of finality and comity than do claims that focus solely on the erroneous imposition of the death penalty. Though challenges to the propriety of imposing a sentence of death are routinely asserted in capital cases, experience has taught us that a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. See *supra*, at 321–322. To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful. Even under the pre-*Sawyer* regime, "in virtually every case, the allegation of actual innocence has been summarily rejected."[40] The threat to judicial resources, finality, and comity posed by claims of actual innocence is thus significantly less than that posed by claims relating only to sentencing.

Of greater importance, the individual interest in avoiding injustice is most compelling in the context of actual innocence. The quintessential miscarriage of justice is the exe-

---

[40] Steiker, Innocence and Federal Habeas, 41 UCLA L. Rev. 303, 377 (1993); see also *id.*, at 377, n. 370 (collecting cases).

cution of a person who is entirely innocent.[41] Indeed, concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected, for example, in the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *In re Winship*, 397 U. S. 358, 372 (1970) (Harlan, J., concurring). See also T. Starkie, Evidence 756 (1824) ("The maxim of the law is . . . that it is better that ninety-nine . . . offenders should escape, than that one innocent man should be condemned"). See generally Newman, Beyond "Reasonable Doubt," 68 N. Y. U. L. Rev. 979, 980–981 (1993).

The overriding importance of this greater individual interest merits protection by imposing a somewhat less exacting standard of proof on a habeas petitioner alleging a fundamental miscarriage of justice than on one alleging that his sentence is too severe. As this Court has noted, "a standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *In re Winship*, 397 U. S., at 370 (Harlan, J., concurring); see also *Addington* v. *Texas*, 441 U. S. 418, 423 (1979). The standard of proof thus reflects "the relative importance attached to the ultimate decision." *Ibid.* Though the *Sawyer* standard was fashioned to reflect the relative importance of a claim of an erroneous sentence, application of that standard to petitioners such as Schlup would give insufficient weight to the correspondingly greater injustice that is implicated by a claim of actual innocence. The

---

[41] See, *e. g., Lankford* v. *Idaho*, 500 U. S. 110, 125 (1991); *Clemons* v. *Mississippi*, 494 U. S. 738, 750, n. 4 (1990); *Booth* v. *Maryland*, 482 U. S. 496, 509, n. 12 (1987); *Solem* v. *Helm*, 463 U. S. 277, 294 (1983); *Gardner* v. *Florida*, 430 U. S. 349, 357–358 (1977) (plurality opinion); *Woodson* v. *North Carolina*, 428 U. S. 280, 303–304, 305 (1976) (plurality opinion of Stewart, Powell, and STEVENS, JJ.).

paramount importance of avoiding the injustice of executing one who is actually innocent thus requires application of the *Carrier* standard.[42]

We recognize, as the State has reminded us, that in *Sawyer* the Court applied its new standard not only to the penalty phase of the case but also to Sawyer's responsibility for arson, one of the elements of the offense of first-degree murder.[43] This fact does not require application of the *Sawyer* standard to a case such as Schlup's. Though formulated as an element of the offense of first-degree murder, the arson functioned essentially as a sentence enhancer. That claim, therefore, is readily distinguishable from a claim, like the one raised by Schlup, that the petitioner is actually innocent. Fealty to the doctrine of *stare decisis* does not, therefore, preclude application of the *Carrier* standard to the facts of this case.[44]

Accordingly, we hold that the *Carrier* "probably resulted" standard rather than the more stringent *Sawyer* standard must govern the miscarriage of justice inquiry when a peti-

---

[42] By our references to *Winship*, of course, we do not suggest that Schlup comes before a habeas court in the same situation as one who has merely been accused of a crime. Having been convicted by a jury of a capital offense, Schlup no longer has the benefit of the presumption of innocence. Cf. *Herrera* v. *Collins*, 506 U. S., at 399 (O'CONNOR, J., concurring). To the contrary, Schlup comes before the habeas court with a strong—and in the vast majority of the cases conclusive—presumption of guilt. Our reference to *Winship* is intended merely to demonstrate that it is quite consistent with our jurisprudence to give content through a burden of proof to the understanding that fundamental injustice would result from the erroneous conviction and execution of an innocent person.

[43] See *Sawyer*, 505 U. S., at 342, n. 8, 349–350.

[44] Nor do we believe that confining *Sawyer*'s more rigorous standard to claims involving eligibility for the sentence of death is anomalous. Our recognition of the significant difference between the injustice that results from an erroneous conviction and the injustice that results from an erroneous sentence is reflected in our decisions that permit reduced procedural protections at sentencing. See, *e. g., Williams* v. *New York*, 337 U. S. 241 (1949).

tioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims.

## VI

The *Carrier* standard requires the habeas petitioner to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." 477 U. S., at 496. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. The petitioner thus is required to make a stronger showing than that needed to establish prejudice.[45] At the same time, the showing of "more likely than not" imposes a lower burden of proof than the "clear and convincing" standard required under *Sawyer*. The *Carrier* standard thus ensures that petitioner's case is truly "extraordinary," *McCleskey*, 499 U. S., at 494, while still providing petitioner a meaningful avenue by which to avoid a manifest injustice.

*Carrier* requires a petitioner to show that he is "actually innocent." As used in *Carrier*, actual innocence is closely related to the definition set forth by this Court in *Sawyer*. To satisfy the *Carrier* gateway standard, a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.

Several observations about this standard are in order. The *Carrier* standard is intended to focus the inquiry on actual innocence. In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evi-

---

[45] See *Strickland* v. *Washington*, 466 U. S. 668, 694 (1984); *United States* v. *Bagley*, 473 U. S. 667, 682 (1985) (Blackmun, J.); *id.*, at 685 (White, J., concurring).

dence that was either excluded or unavailable at trial. Indeed, with respect to this aspect of the *Carrier* standard, we believe that Judge Friendly's description of the inquiry is appropriate: The habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial."[46]

The consideration in federal habeas proceedings of a broader array of evidence does not modify the essential meaning of "innocence." The *Carrier* standard reflects the proposition, firmly established in our legal system, that the line between innocence and guilt is drawn with reference to a reasonable doubt. See *In re Winship*, 397 U. S. 358 (1970). Indeed, even in *Sawyer*, with its emphasis on eligibility for the death penalty, the Court did not stray from the understanding that the eligibility determination must be made with reference to reasonable doubt. Thus, whether a court is assessing eligibility for the death penalty under *Sawyer*, or is deciding whether a petitioner has made the requisite showing of innocence under *Carrier*, the analysis must incorporate the understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and innocence.[47]

---

[46] 38 U. Chi. L. Rev., at 160.

[47] Actual innocence, of course, does not require innocence in the broad sense of having led an entirely blameless life. Indeed, Schlup's situation provides a good illustration. At the time of the crime at issue in this case, Schlup was incarcerated for an earlier offense, the sordid details of which he acknowledged in his testimony at the punishment phase of his trial. Such earlier criminal activity has no bearing on whether Schlup is actually innocent of Dade's murder.

As we have explained, *supra*, at 313–317, Schlup's claim of innocence is fundamentally different from the claim advanced in *Herrera*. The standard that we apply today, therefore, will not foreclose the application of factual innocence to the analysis of such claims.

The meaning of actual innocence as formulated by *Sawyer* and *Carrier* does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty. It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

We note finally that the *Carrier* standard requires a petitioner to show that it is more likely than not that "no reasonable juror" would have convicted him. The word "reasonable" in that formulation is not without meaning. It must be presumed that a reasonable juror would consider fairly all of the evidence presented. It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt.[48]

---

[48] THE CHIEF JUSTICE suggests that the *Carrier* standard is "a classic mixing of apples and oranges." *Post*, at 339. That standard, however, is no more a mixing of apples and oranges than is the standard adopted by the Court in *Sawyer*. See *Sawyer*, 505 U. S., at 336 (requiring that petitioner show "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty"). Though it is true that "'[m]ore likely than not'" is a "quintessential charge to a finder of fact," *post*, at 339, that is equally true of the "clear and convincing evidence" component of the *Sawyer* formulation. There is thus no reason to believe that the *Carrier* standard is any more likely than the *Sawyer* standard to be "a source of confusion." *Post*, at 339.

Nor do we accept THE CHIEF JUSTICE's description of the *Carrier* standard as a "hybrid." *Post*, at 339. Finders of fact are often called upon to make predictions about the likely actions of hypothetical "reasonable" actors. Thus, the application of "more likely than not" to the habeas court's assessment of the actions of reasonable jurors is neither illogical nor unusual.

Though the *Carrier* standard requires a substantial showing, it is by no means equivalent to the standard of *Jackson* v. *Virginia*, 443 U. S. 307 (1979), that governs review of claims of insufficient evidence. The *Jackson* standard, which focuses on whether any rational juror could have convicted, looks to whether there is sufficient evidence which, if credited, could support the conviction. The *Jackson* standard thus differs in at least two important ways from the *Carrier* standard. First, under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review. In contrast, under the gateway standard we describe today, the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial. In such a case, the habeas court may have to make some credibility assessments. Second, and more fundamentally, the focus of the inquiry is different under *Jackson* than under *Carrier*. Under *Jackson*, the use of the word "could" focuses the inquiry on the power of the trier of fact to reach its conclusion. Under *Carrier*, the use of the word "would" focuses the inquiry on the likely behavior of the trier of fact.

Indeed, our adoption of the phrase "more likely than not" reflects this distinction. Under *Jackson*, the question whether the trier of fact has power to make a finding of guilt requires a binary response: Either the trier of fact has power as a matter of law or it does not. Under *Carrier*, in contrast, the habeas court must consider what reasonable triers of fact are likely to do. Under this probabilistic inquiry, it makes sense to have a probabilistic standard such as "more likely than not."[49] Thus, though under *Jackson* the mere existence of sufficient evidence to convict would be determinative of petitioner's claim, that is not true under *Carrier*.

---

[49] The "clear and convincing" standard adopted in *Sawyer* reflects this same understanding of the relevant inquiry.

We believe that the Eighth Circuit's erroneous application of the *Sawyer* standard below illustrates this difference. In determining that Schlup had failed to satisfy the *Sawyer* standard, the majority noted that "two prison officials, who were eyewitnesses to the crime, positively identified Mr. Schlup as one of the three perpetrators of the murder. This evidence was clearly admissible and stands unrefuted except to the extent that Mr. Schlup now questions its credibility." 11 F. 3d, at 741.

The majority then continued:

> "[E]ven if we disregard the source of the new evidence, the eleventh-hour nature of the information, and a presentation coming almost six years after the trial; it is simply not possible to say that the appellant has shown by clear and convincing evidence that but for a constitutional error no reasonable jury would have found him guilty." *Ibid.*

However, Schlup's evidence includes the sworn statements of several eyewitnesses that Schlup was not involved in the crime. Moreover, Schlup has presented statements from Green and Faherty that cast doubt on whether Schlup could have participated in the murder and still arrived at the dining room 65 seconds before the distress call was received. Those new statements may, of course, be unreliable. But if they are true—as the Court of Appeals assumed for the purpose of applying its understanding of the *Sawyer* standard— it surely cannot be said that a juror, conscientiously following the judge's instructions requiring proof beyond a reasonable doubt, would vote to convict. Under a proper application of either *Sawyer* or *Carrier*, petitioner's showing of innocence is not insufficient solely because the trial record contained sufficient evidence to support the jury's verdict.

In this case, the application of the *Carrier* standard arises in the context of a request for an evidentiary hearing. In applying the *Carrier* standard to such a request, the District

Court must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial. Obviously, the court is not required to test the new evidence by a standard appropriate for deciding a motion for summary judgment. Cf. *Agosto* v. *INS*, 436 U. S. 748, 756 (1978) ("[A] district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"). Instead, the court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.

Because both the Court of Appeals and the District Court evaluated the record under an improper standard, further proceedings are necessary. The fact-intensive nature of the inquiry, together with the District Court's ability to take testimony from the few key witnesses if it deems that course advisable, convinces us that the most expeditious procedure is to order that the decision of the Court of Appeals be vacated and that the case be remanded to the Court of Appeals with instructions to remand to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.

I write to explain, in light of the dissenting opinions, what I understand the Court to decide and what it does not.

The Court holds that, in order to have an abusive or successive habeas claim heard on the merits, a petitioner who cannot demonstrate cause and prejudice "must show that it is more likely than not that no reasonable juror would have convicted him" in light of newly discovered evidence of innocence. *Ante*, at 327. This standard is

higher than that required for prejudice, which requires only "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt," *Strickland* v. *Washington,* 466 U. S. 668, 695 (1984). Instead, a petitioner does not pass through the gateway erected by *Murray* v. *Carrier,* 477 U. S. 478 (1986), if the district court believes it more likely than not that there is any juror who, acting reasonably, would have found the petitioner guilty beyond a reasonable doubt. And the Court's standard, which focuses the inquiry on the likely behavior of jurors, is substantively different from the rationality standard of *Jackson* v. *Virginia,* 443 U. S. 307 (1979). *Jackson,* which emphasizes the authority of the factfinder to make conclusions from the evidence, establishes a standard of review for the sufficiency of record evidence—a standard that would be ill suited as a burden of proof, see *Concrete Pipe & Products of Cal., Inc.* v. *Construction Laborers Pension Trust for Southern Cal.,* 508 U. S. 602, 624–626 (1993). The Court today does not sow confusion in the law. Rather, it properly balances the dictates of justice with the need to ensure that the actual innocence exception remains only a "'safety valve' for the 'extraordinary case,'" *Harris* v. *Reed,* 489 U. S. 255, 271 (1989) (O'CONNOR, J., concurring).

Moreover, the Court does not, and need not, decide whether the fundamental miscarriage of justice exception is a discretionary remedy. It is a paradigmatic abuse of discretion for a court to base its judgment on an erroneous view of the law. See *Cooter & Gell* v. *Hartmarx Corp.,* 496 U. S. 384, 405 (1990). Having decided that the district court committed legal error, and thus abused its discretion, by relying on *Sawyer* v. *Whitley,* 505 U. S. 333 (1992), instead of *Murray* v. *Carrier, supra,* the Court need not decide the question—neither argued by the parties nor passed upon by the Court of Appeals—whether abuse of discretion is the proper standard of review. In reversing the judgment of the Court

of Appeals, therefore, the Court does not disturb the traditional discretion of district courts in this area, nor does it speak to the standard of appellate review for such judgments.

With these observations, I join the Court's opinion.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE KENNEDY and JUSTICE THOMAS join, dissenting.

The Court decides that the threshold standard for a showing of "actual innocence" in a successive or abusive habeas petition is that set forth in *Murray* v. *Carrier*, 477 U. S. 478 (1986), rather than that set forth in *Sawyer* v. *Whitley*, 505 U. S. 333 (1992). For reasons which I later set out, I believe the *Sawyer* standard should be applied to claims of guilt or innocence as well as to challenges to a petitioner's sentence. But, more importantly, I believe the Court's exegesis of the *Carrier* standard both waters down the standard suggested in that case, and will inevitably create confusion in the lower courts.

On February 3, 1984, three white inmates attacked and killed a black inmate named Arthur Dade. At trial, testimony by Sergeant Roger Flowers and Officer John Maylee indicated that inmate Rodnie Stewart threw a container of steaming liquid into Dade's face, petitioner jumped on Dade's back rendering him defenseless, and inmate Robert O'Neal proceeded to stab Dade to death. Petitioner's trial counsel attempted to discredit both eyewitness identifications. As to Sergeant Flowers, counsel argued that Flowers had brought a visitor into petitioner's cell less than an hour before the stabbing, and, therefore, Flowers had Schlup "on the brain." Trial Tr. 493–494. Trial counsel attempted to discredit Officer Maylee's identification by arguing that Maylee was too far from the scene to properly view the incident. Through discovery, petitioner's trial counsel uncovered a videotape in which petitioner is the first inmate to enter the cafeteria. One minute and five seconds after petitioner

enters the cafeteria, a group of guards run out in apparent response to a distress call. Twenty-six seconds later, O'Neal is seen entering the cafeteria. Petitioner's trial counsel argued that the videotape established that petitioner could not have committed the murder because there was insufficient time for him to commit the crime and arrive at the cafeteria one minute and five seconds prior to the distress call. Petitioner's trial counsel also presented two alibi witnesses who testified that petitioner had walked in front of them to the cafeteria without incident.

The jury considered this conflicting evidence, determined that petitioner's story was not credible, and convicted him of capital murder. During the sentencing component of trial, the prosecution presented evidence that there were two statutory aggravating factors that warranted imposition of the death penalty: petitioner committed the murder in a place of lawful confinement, and petitioner had a substantial history of serious assaultive criminal convictions. As to the second aggravating factor, the prosecution presented testimony that for two weeks, petitioner had brutally beaten, tortured, and sodomized a cellmate in a county jail. The prosecution also presented testimony that petitioner was convicted of aggravated assault for slitting a cellmate's throat. On cross-examination, petitioner presented his version of the prior incidents. The jury considered this evidence, rejected petitioner's story, and returned a sentence of death.

On appeal, the Missouri Supreme Court affirmed petitioner's conviction and death sentence. Petitioner then filed state collateral proceedings claiming, among other things, that his trial counsel was ineffective for failing to present additional alibi witnesses and for failing to investigate fully the circumstances of the murder. The Missouri Circuit Court determined that petitioner's counsel provided effective assistance of counsel. The Missouri Supreme Court affirmed the denial of postconviction relief.

Petitioner then filed his first federal habeas petition claiming that his trial counsel was ineffective at both the guilt and penalty phases of trial. Though he previously refused to identify Randy Jordan as the alleged third participant in the murder, petitioner faulted his trial counsel for failing to call Randy Jordan as a witness.[1] The District Court denied relief. A panel of the Court of Appeals for the Eighth Circuit concluded on the merits that petitioner's trial counsel had not been ineffective at the guilt or penalty phases of trial.[2] Petitioner sought review of the panel's decision by the en banc court. No Eighth Circuit judge questioned the panel's conclusion that petitioner's trial counsel provided effective assistance of counsel during the guilt phase of trial.

Petitioner filed a second federal habeas petition, again claiming that his trial counsel was ineffective at both the guilt and penalty phases of trial. Petitioner supplemented this filing with an affidavit from a former inmate, John Green. Green's affidavit related to the timing of the distress call. In his most recent statement, Green swore that Sergeant Flowers "was on his way to break up the fight when he told me to call base. I immediately went into the office, picked up the phone, and called base." App. 122.[3] Under

---

[1] The Missouri Circuit Court found that "[d]efense counsel did not interview Randy Jordan, whom Petitioner now alleges was the third participant in the murder with which the Petitioner was charged, because the Petitioner while maintaining someone else committed the acts attributed to him, refused to give the name of that person to his counsel." *Schlup* v. *Delo*, Respondent's Exhibit J, pp. 49–50.

[2] Senior Circuit Judge Heaney took issue only with the majority's conclusion that petitioner's trial counsel had rendered effective assistance at the penalty phase of trial. Cf. *Schlup* v. *Armontrout*, 941 F. 2d 631, 642 (1991) ("I disagree with the court's conclusion that Schlup was not prejudiced by his counsel's ineffectiveness during the penalty phase") (dissenting opinion).

[3] On the day of the incident Green told prison investigators that he had not observed the murder. At Stewart's trial, while under oath, Green testified that he saw no actual fight take place and made no mention of his call to base. App. 140. Green now also swears that he "called base . . . within seconds of Dade hitting the ground." *Id.*, at 123.

this timing sequence, petitioner submitted that he "ha[d] produced proof, which could not have been fabricated, that the call to which the guards [in the cafeteria] responded came seconds after the stabbing." *Id.*, at 100–101. Further, petitioner claimed that "Green's testimony thus makes it impossible, under any view of the evidence, for Schlup to have participated in Dade's murder: for thirty seconds to a minute before the distress call, the videotape plainly shows Lloyd Schlup in the prison dining room, quietly getting his lunch." Brief for Petitioner 12. Thus, petitioner's claim of "actual innocence" depends, in part, on the assumption that the officers in the cafeteria responded to Green's distress call "within seconds" of Dade hitting the ground.[4]

The District Court denied petitioner's second habeas petition without conducting an evidentiary hearing. While on appeal, petitioner supplemented his habeas petition with an additional affidavit from Robert Faherty, a former prison guard who previously testified at petitioner's trial. A divided panel of the Eighth Circuit applied the *Sawyer* standard to petitioner's gateway claim of "actual innocence" and determined that petitioner failed to meet that standard. The Eighth Circuit denied rehearing en banc. We granted certiorari to determine when, absent a showing of cause

---

[4] One problem with this theory is that O'Neal, an undisputed participant in the murder, entered the cafeteria 26 seconds after the guards responded to the distress call. As respondent explained at oral argument: "[I]f you believe that [Green] radioed in immediately upon the time of the body falling . . . then you look at the videotape, and there is only 26 seconds between the time that that call was supposedly made by Green and the time that O'Neal comes into the cafeteria downstairs, and all of the evidence in this case shows it's impossible for O'Neal, the admitted murderer . . . to have run down, . . . broken a window, thrown the knife out the window, come back, washed his hands . . . and go[ne] down to the cafeteria, *if you hold Green's present statement as controlling, the murder never occurred*." Tr. of Oral Arg. 30–31 (emphasis added). Thus, as the Court acknowledges, *ante*, at 308, n. 17, there was a delay between the time of the murder and the time that the guards in the cafeteria responded to the distress call.

and prejudice, a district court may consider the merits of an abusive or successive habeas petition. 511 U. S. 1003 (1994).

In *Kuhlmann* v. *Wilson*, 477 U. S. 436 (1986), the Court examined when a federal court could entertain a successive habeas petition. A plurality of the Court determined that the " 'ends of justice' " required a district court to entertain the merits of an otherwise defaulted petition where the prisoner supplemented his constitutional claim with a showing of factual innocence. *Id.*, at 454. After citing Judge Friendly's definition of factual innocence, the plurality summarily determined that the District Court should not have entertained Wilson's petition because the evidence of guilt in his case had been " 'nearly overwhelming.' " *Id.*, at 455.

In *Carrier*, the Court determined that a federal court could not review a procedurally defaulted habeas petition unless the petitioner demonstrated both cause for the default as well as prejudice resulting from the constitutional error. 477 U. S., at 492.[5] The *Carrier* Court, however, left open the possibility that in a truly extraordinary case, a federal habeas court might excuse a failure to establish cause and prejudice where " 'a constitutional violation has probably resulted in the conviction of one who is *actually innocent.*' " *Ante*, at 327, quoting 477 U. S., at 496 (emphasis added).

In *Sawyer*, we described in some detail the showing of actual innocence required when a habeas petitioner brings an otherwise abusive, successive, or procedurally defaulted claim challenging the imposition of his death sentence, rather than his guilt of the crime. 505 U. S., at 339–347. There the Court emphasized that innocence of the death penalty,

---

[5] The Court explicitly rejected the contention that "cause need not be shown if actual prejudice is shown," even where the constitutional claims "call[ed] into question the reliability of an adjudication of *legal guilt.*" 477 U. S., at 495 (emphasis added); see also *Engle* v. *Isaac*, 456 U. S. 107, 129 (1982).

like its "'actual innocence'" counterpart, is "a very narrow exception," and that in order to be "workable it must be subject to determination by relatively objective standards." *Id.*, at 341. Thus, we concluded that a habeas petitioner who challenged his sentence in an otherwise defaulted petition must show "by clear and convincing evidence that but for constitutional error, no reasonable juror would [have found the petitioner] eligible for the death penalty." *Id.*, at 348.

We have never until today had to similarly flesh out the standard of "actual innocence" in the context of a habeas petitioner claiming innocence of the crime. Thus, I agree that the question of what threshold standard should govern is an open one. As I have said earlier, I disagree with the Court's conclusion that *Carrier,* and not *Sawyer,* provides the proper standard. But far more troubling than the choice of *Carrier* over *Sawyer* is the watered down and confusing version of *Carrier* which is served up by the Court.

As the Court notes, to satisfy *Carrier* a habeas petitioner must demonstrate that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Ante,* at 327 (quoting *Carrier, supra,* at 496). The Court informs us that a showing of "actual innocence" requires a habeas petitioner to "show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Ante,* at 327. But this is a classic mixing of apples and oranges. "More likely than not" is a quintessential charge to a finder of fact, while "no reasonable juror would have convicted him in the light of the new evidence" is an equally quintessential conclusion of law similar to the standard that courts constantly employ in deciding motions for judgment of acquittal in criminal cases. The hybrid which the Court serves up is bound to be a source of confusion. Because new evidence not presented at trial will almost always be involved in these claims of actual innocence, the legal standard for judgment of acquittal cannot

be bodily transposed for the determination of "actual innocence," but the sensible course would be to modify that familiar standard, see *infra*, at 341–342, rather than to create a confusing hybrid.

In the course of elaborating the *Carrier* standard, the Court takes pains to point out that it differs from the standard enunciated in *Jackson* v. *Virginia*, 443 U. S. 307 (1979), for review of the sufficiency of the evidence to meet the constitutional standard of proof beyond a reasonable doubt. Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*, at 319. This standard requires a solely retrospective analysis of the evidence considered by the jury and reflects a healthy respect for the trier of fact's "responsibility . . . to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Ibid.*

The Court fails to acknowledge expressly the similarities between the standard it has adopted and the *Jackson* standard. A habeas court reviewing a claim of actual innocence does not write on a clean slate. Cf. *Barefoot* v. *Estelle*, 463 U. S. 880, 887 (1983) ("Federal courts are not forums in which to relitigate state trials"); *Herrera* v. *Collins*, 506 U. S. 390, 416 (1993) ("[I]n state criminal proceedings the trial is the paramount event for determining the guilt or innocence of the defendant"); *Wainwright* v. *Sykes*, 433 U. S. 72, 90 (1977) ("Society's resources have been concentrated at [the state trial] in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens"). Therefore, as the Court acknowledges, a petitioner making a claim of actual innocence under *Carrier* falls short of satisfying his burden if the reviewing court determines that *any* juror reasonably would have found petitioner guilty of the crime. See *ante*, at 329; cf. *Jackson*, *supra*, at 318–319.

The situation presented by a claim of actual innocence in a federal habeas petition is obviously different from that presented in *Jackson* because the habeas court analyzing an "actual innocence" claim is faced with a body of evidence that has been supplemented since the original trial. The reviewing court must somehow predict the effect that this new evidence would have had on the deliberations of reasonable jurors. It must necessarily weigh this new evidence in some manner, and may need to make credibility determinations as to witnesses who did not appear before the original jury. This new evidence, however, is not a license for the reviewing court to disregard the presumptively proper determination by the original trier of fact.

I think the standard enunciated in *Jackson*, properly modified because of the different body of evidence that must be considered, faithfully reflects the language used in *Carrier*. The habeas judge should initially consider the motion on the basis of the written submissions made by the parties. As the Court suggests, habeas courts will be able to resolve the great majority of "actual innocence" claims routinely without any evidentiary hearing. See *ante*, at 324. This fact is important because, as we noted in *Sawyer:* "In the every day context of capital penalty proceedings, a federal district judge typically will be presented with a successive or abusive habeas petition a few days before, or even on the day of, a scheduled execution, and will have only a limited time to determine whether a petitioner has shown that his case falls within the 'actual innocence' exception if such a claim is made." 505 U. S., at 341 (footnote omitted).

But in the highly unusual case where the district court believes on the basis of written submissions that the necessary showing of "actual innocence" may be made out, it should conduct a limited evidentiary hearing at which the affiants whose testimony the court believes to be crucial to the showing of actual innocence are present and may be cross-examined as to veracity, reliability, and all of the other

elements that affect the weight to be given the testimony of a witness. After such a hearing, the district court would be in as good a position as possible to make the required determination as to the showing of actual innocence.

The present state of our habeas jurisprudence is less than ideal in its complexity, but today's decision needlessly adds to that complexity. I believe that by adopting the *Sawyer* standard both for attacks on the sentence and on the judgment of conviction, we would take a step in the direction of simplifying this jurisprudence. See *Keeney* v. *Tamayo-Reyes,* 504 U. S. 1, 10 (1992) (noting the importance of uniformity in the law of habeas corpus). The *Sawyer* standard strikes the proper balance among the State's interest in finality, *McCleskey* v. *Zant,* 499 U. S. 467, 491–492 (1991), the federal courts' respect for principles of federalism, see, *e. g., Teague* v. *Lane,* 489 U. S. 288, 309 (1989) (plurality opinion), and "the ultimate equity on the prisoner's side—a sufficient showing of actual innocence," *Withrow* v. *Williams,* 507 U. S. 680, 700 (1993) (O'CONNOR, J., concurring in part and dissenting in part). The Court of Appeals fully analyzed petitioner's new evidence and determined that petitioner fell way short of " 'showing by clear and convincing evidence [that] no reasonable juror would find him [guilty of murder].' " 11 F. 3d 738, 743 (CA8 1993) (quoting *Sawyer, supra,* at 348). I agree and therefore would affirm.

But if we are to adopt the *Carrier* standard, it should not be the confusing exegesis of that standard contained in the Court's opinion. It should be based on a modified version of *Jackson* v. *Virginia,* with a clearly defined area in which the district court may exercise its discretion to hold an evidentiary hearing.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

A federal statute entitled "Finality of Determination"—to be found at §2244 of Title 28 of the United States Code—

specifically addresses the problem of second and subsequent petitions for the writ of habeas corpus. The reader of today's opinion will be unencumbered with knowledge of this law, since it is not there discussed or quoted, and indeed is only cited *en passant*. See *ante*, at 318, 320. Rather than asking what the statute says, or even what we have said the statute says, the Court asks only what is the fairest standard to apply, and answers that question by looking to the various semiconsistent standards articulated in our most recent decisions—minutely parsing phrases, and seeking shades of meaning in the interstices of sentences and words, as though a discursive judicial opinion were a statute. I would proceed differently. Within the very broad limits set by the Suspension Clause, U. S. Const., Art. I, § 9, cl. 2, the federal writ of habeas corpus is governed by statute. Section 2244 controls this case; the disposition it announces is plain enough, and our decisions contain nothing that would justify departure from that plain meaning.

Section 2244(b) provides:

"When after an evidentiary hearing on the merits of a material factual issue, or after a hearing on the merits of an issue of law, a person in custody pursuant to the judgment of a State court has been denied by a court of the United States or a justice or judge of the United States release from custody or other remedy on an application for a writ of habeas corpus, a subsequent application for a writ of habeas corpus in behalf of such person need not be entertained by a court of the United States or a justice or judge of the United States unless the application alleges and is predicated on a factual or other ground not adjudicated on the hearing of the earlier application for the writ, and unless the court, justice, or judge is satisfied that the applicant has not on the earlier application deliberately withheld the newly asserted ground or otherwise abused the writ."

A long sentence, but not a difficult one. A federal district court that receives a second or subsequent petition for the writ of habeas corpus, when a prior petition has been denied on the merits, "need not . . . entertai[n]" (*i. e.,* may dismiss) the petition unless it is neither (to use our shorthand terminology) successive nor abusive. See also Habeas Corpus Rule 9(b) ("A second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief . . ."). Today, however, the Court obliquely but unmistakably pronounces that a successive or abusive petition *must* be entertained and may *not* be dismissed so long as the petitioner makes a sufficiently persuasive showing that a "fundamental miscarriage of justice" has occurred. *Ante,* at 316 ("[I]f a petitioner such as Schlup presents [adequate] evidence of innocence . . . the petitioner should be allowed to pass through the gateway and argue the merits"); *ante,* at 319–321.[1] That conclusion flatly contradicts the statute, and is not required by our precedent.

Our earliest cases, from an era before Congress legislated rules to govern the finality of habeas adjudication, held that successive or abusive petitions were "to be disposed of in the exercise of a sound judicial discretion guided and controlled by a consideration of whatever has a rational bearing on the propriety of the discharge sought," and that when weighing those considerations the district court could give "controlling weight" to "a prior refusal to discharge on a like application." *Salinger* v. *Loisel,* 265 U. S. 224, 231 (1924) (successive peti-

---

[1] The claim that "the Court does not, and need not, decide whether the fundamental miscarriage of justice exception is a discretionary remedy," *ante,* at 333 (O'CONNOR, J., concurring), is not in my view an accurate description of what the Court's opinion says. Of course the concurrence's merely making the claim causes it to be an accurate description of what the Court today *holds,* since the narrower ground taken by one of the Justices comprising a five-Justice majority becomes the law. *Marks* v. *United States,* 430 U. S. 188, 193 (1977).

tion); see also *Wong Doo* v. *United States*, 265 U. S. 239, 240–241 (1924) (abusive petition). In *Salinger* the Court particularly noted: "Here the prior refusal to discharge [the prisoner] was by a court of coordinate jurisdiction and was affirmed in a considered opinion by a Circuit Court of Appeals. Had the District Court disposed of the later applications on that ground, its discretion would have been well exercised and we should sustain its action without saying more." 265 U. S., at 232. Section 2244 is no more and no less than a codification of this approach. It is one of the disheartening ironies of today's decision that the Court not merely disregards a statute, but in doing so denies district judges the very discretion that the Court itself freely entrusted to them before Congress spoke.

In 1948 Congress for the first time addressed the problem of repetitive petitions by enacting the predecessor of the current § 2244, which provided as follows:

> "No circuit or district judge shall be required to entertain an application for a writ of habeas corpus to inquire into the detention of a person pursuant to a judgment of a court of the United States, or of any State, if it appears that the legality of such detention has been determined by a judge or court of the United States on a prior application for a writ of habeas corpus and the petition presents no new ground not theretofore presented and determined, *and the judge or court is satisfied that the ends of justice will not be served by such inquiry.*" 28 U. S. C. § 2244 (1964 ed.) (emphasis added).

This provision was construed in *Sanders* v. *United States*, 373 U. S. 1 (1963), and (with unimpeachable logic) was held to mean that "[c]ontrolling weight may be given to denial of a prior application for federal habeas corpus [under 28 U. S. C. § 2254] only if (1) the same ground presented in the subsequent application was determined adversely to the applicant on the prior application, (2) the prior determination was on

the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application." *Id.,* at 15. Thus, there appeared for the first time in our decisions the notion that a habeas court has *"the duty"* to reach the merits of a subsequent petition "if the ends of justice demand," *id.,* at 18–19—and it appeared for the perfectly good reason that the statute, as then written, imposed such a duty. And even as to that duty the *Sanders* Court added a "final qualification" that the Court today would do well to remember:

> "The principles governing . . . denial of a hearing on a successive application are addressed to the sound discretion of the federal trial judges. Theirs is the major responsibility for the just and sound administration of the federal collateral remedies, and theirs must be the judgment as to whether a second or successive application shall be denied without consideration of the merits." *Id.,* at 18.

Three years after *Sanders,* however, Congress amended § 2244 to establish different finality rules for federal prisoner petitions (filed under § 2255) and state prisoner petitions (filed under § 2254). Section 2244(a), which addresses petitions by federal prisoners, retains the "ends of justice" proviso from the old statute; but § 2244(b) omits it, thus restricting the district courts' *obligation* to entertain petitions by state prisoners to cases where the petition is neither successive nor abusive. One might have expected that this not-so-subtle change in the statute would change our interpretation of it, and that we would modify *Sanders* by holding that a district court could exercise its discretion to give controlling weight to the prior denial—which was of course precisely what *Salinger* envisioned.

Yet when the new version of § 2244(b) was first construed, in *Kuhlmann* v. *Wilson,* 477 U. S. 436 (1986), a plurality of the Court announced that it would "continue to rely on the

reference in *Sanders* to the 'ends of justice,'" 477 U. S., at 451, and concluded that "the 'ends of justice' require federal courts to entertain [successive] petitions only where the prisoner supplements his constitutional claim with a colorable showing of factual innocence." *Id.*, at 454. That conclusion contains two complementary propositions. The first is that a habeas court may *not* reach the merits of a barred claim *unless* actual innocence is shown; this was the actual judgment of the opinion (one cannot say the holding, since the opinion was a mere plurality). See *id.*, at 455 (stating that the District Court and Court of Appeals should have dismissed the successive petition because the petitioner's claim of innocence was meritless). The second is that a habeas court *must* hear a claim of actual innocence and reach the merits of the petition if the claim is sufficiently persuasive; this was the purest dictum. It is the Court's prerogative to adopt that dictum today, but to adopt it without analysis, as though it were binding precedent, will not do. The *Kuhlmann* plurality opinion lacks formal status as authority, and, as discussed below, no holding of this Court binds us to it. A decision to follow it must be justified by reason, not simply asserted by will.

And if reasons are to be given, justification of the *Kuhlmann* opinion will be found difficult indeed. The plurality's central theory is that "the permissive language of §2244(b) gives federal courts discretion to entertain successive petitions under some circumstances," so that "[u]nless [the] 'rare instances' [in which successive petitions will be entertained] are to be identified by whim or caprice, district judges must be given guidance for determining when to exercise the limited discretion granted them by §2244(b)." See 477 U. S., at 451. What the plurality then proceeds to do, however, is not to "guide" the discretion, but to eliminate it entirely, dividing the entire universe of successive and abusive petitions into those that *must not* be entertained (where there is no showing of innocence) and those that *must* be entertained (where

there is such a showing). This converts a statute redolent of permissiveness (*"need not* entertain") into a rigid command.[2]

The *Kuhlmann* plurality's concern about caprice is met— as it is met for all decisions committed by law to the discretion of lower courts—by applying traditional "abuse-of-discretion" standards. A judge who dismisses a successive petition because he misconceives some question of law, because he detests the petitioner's religion, or because he would rather play golf, may be reversed. A judge who dismisses a successive petition because it is the petitioner's twenty-second, rather than his second, because its "only purpose is to vex, harass, or delay," *Sanders, supra,* at 18, or because the constitutional claims can be seen to be frivolous on the face of the papers—for any of the numerous considerations that have "a *rational* bearing on the propriety of the discharge sought," *Salinger,* 265 U. S., at 231 (emphasis added)—may not be commanded to reach the merits because "the ends of justice" require. Here as elsewhere in the law, to say that a district judge may not abuse his discretion is merely to say that the action in question (dismissing a successive petition) may not be done without considering relevant factors and giving a "justifying reason," *Foman* v. *Davis,* 371 U. S. 178, 182 (1962). See also *American Dredging Co.* v. *Miller,* 510 U. S. 443, 455 (1994). It is a failure of logic, and an arrogation of authority, to "guide" that discretion by holding that what Congress authorized the district court to do may not be done at all.

The Court's assumption that the requirement imposed by the *Kuhlmann* plurality should be taken as law can find no support in our subsequent decisions. To be sure, some cases restate the supposed duty in the course of historical surveys of the area. See, *e. g., McCleskey* v. *Zant,* 499 U. S.

---

[2] The present case does not, of course, present the question whether the *Kuhlmann* plurality was wrong to identify a category of petitions that *must not* be entertained—a disposition that is at least compatible with the text of § 2244(b).

467, 495 (1991) (*"Kuhlmann* . . . required federal courts to entertain successive petitions when a petitioner supplements a constitutional claim with a 'colorable showing of factual innocence'"). But if we are to lavish upon the verbiage of our opinions the detailed attention more appropriately reserved for the statute itself, more of the cases (and some of the *same* cases) have described the miscarriage-of-justice doctrine as a rule of permission rather than a rule of obligation. See, *e. g., Sawyer* v. *Whitley,* 505 U. S. 333, 339 (1992) ("[*Kuhlmann* held that] the miscarriage of justice exception would *allow* successive claims to be heard"); *Mc-Cleskey,* 499 U. S., at 494 ("Federal courts retain the *authority* to issue the writ [in cases of fundamental miscarriage of justice]"); *id.,* at 494–495 ("If petitioner cannot show cause, the failure to raise the claim in an earlier petition *may* nonetheless be excused if he or she can show that a fundamental miscarriage of justice would result from a failure to entertain the claim"); *Murray* v. *Carrier,* 477 U. S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court *may* grant the writ even in the absence of a showing of cause for the procedural default") (emphasis added in all quotations).

Of course the latter cases provide as much or as little authority for the right reading of the statute as the former provide for the wrong reading. The truth is that there is simply nothing in this scattering of phrases, this handful of silences and assumptions, by which even the conscience most scrupulous in matters of *stare decisis* could count itself bound either way; for in no case after *Kuhlmann* has the question whether § 2244(b) creates an *obligation* to entertain successive or abusive petitions been necessary to the decision. In both *Sawyer* and *McCleskey* the Court affirmed the judgments of lower courts that had dismissed the petition. See *Sawyer, supra,* at 338; *McCleskey, supra,* at 503. Those decisions could not, and did not, announce *as a*

*holding* that refusal to entertain a petition can be reversible error.

Rather than advancing a different reading of the statute, the Court gives in essence only one response to all of this: that the law of federal habeas corpus is a product of "the interplay between statutory language and judicially managed equitable considerations." *Ante,* at 319, n. 35. This sort of vague talk might mean one of two things, the first inadequate, the second unconstitutional. It might mean that the habeas corpus statute is riddled with gaps and ambiguities that we have traditionally filled or clarified by a process of statutory interpretation that shades easily into a sort of federal common law. See, *e. g., Brecht* v. *Abrahamson,* 507 U. S. 619, 633 (1993). That is true enough. There assuredly are, however, many legal questions on which the habeas corpus statute is neither silent nor ambiguous; and unless the question in this case is one on which the statute *is* silent or ambiguous (in which event the Court should explain why that is so), the response is irrelevant. On the other hand, the Court's response might mean something altogether different and more alarming: that even where the habeas statute does speak clearly to the question at hand, it is but one "consideratio[n]," *ante,* at 319, n. 35, relevant to resolution of that question. Given that federal courts have no inherent power to issue the writ, *Ex parte Bollman,* 4 Cranch 75, 94–95 (1807), that response would be unconstitutional. See U. S. Const., Art. VI, cl. 2.

There is thus no route of escape from the Court's duty to confront the statute today. I would say, as the statute does, that habeas courts need not entertain successive or abusive petitions. The courts whose decisions we review declined to entertain the petition, and I find no abuse of discretion in the record. (I agree with THE CHIEF JUSTICE that they were correct to use *Sawyer* v. *Whitley, supra,* as the legal standard for determining claims of actual innocence. See

*ante*, at 334.)[3]   Therefore, "we should sustain [their] action without saying more."   *Salinger*, 265 U. S., at 232.

For these reasons, I respectfully dissent.

---

[3] Even if they were wrong in that, it would not be correct to conclude that the *judgment* must necessarily be reversed.   See *ante*, at 333–334 (O'CONNOR, J., concurring).   Our habeas cases have not so held.   See *Wong Doo* v. *United States*, 265 U. S. 239, 241 (1924) (affirming even though "the courts below erred in applying the inflexible doctrine of *res judicata*" to dismiss an abusive petition, because "it does not follow that the judgment should be reversed; for it plainly appears that the situation was one where, according to a sound judicial discretion, controlling weight must have been given to the prior refusal").