

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-29-2008

# Hutson v. Vaughn

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-2155

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Hutson v. Vaughn" (2008). *2008 Decisions.* Paper 1694.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1694

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 04-2155
_____

ROBERT HUTSON,

Appellant,

v.

DAVID DIGUGLIELMO*, State Correctional Institution, Graterford;
THE DISTRICT ATTORNEY OF THE COUNTY OF PHILADELPHIA;
THE ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA

(*Amended per order of 12/15/04)
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 00-cv-06382)
District Judge: Hon. Cynthia M. Rufe
_____

Submitted Under Third Circuit LAR 34.1(a)
December 7, 2007
_____

Before: McKEE, CHAGARES, and HARDIMAN, Circuit Judges.

_____

(Filed: January 29, 2008)
_____

OPINION OF THE COURT
_____

CHAGARES, Circuit Judge.

Robert Hutson is serving a life sentence for first degree murder. He claims that he is actually innocent and appeals the denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Because Hutson's petition does not demonstrate that his conviction constitutes a fundamental miscarriage of justice, we will affirm the District Court's decision to deny the petition.

I.

On May 19, 1983, at approximately 12:30 p.m., an African-American man riding a blue ten-speed bicycle shot and killed Keith Moody in North Philadelphia. On March 17, 1984, a Pennsylvania jury convicted Hutson of murdering Moody. The government's evidence came primarily from three sources. First, eyewitness Carl Rainey selected Hutson's photo from an array and, at trial, testified that he saw Hutson shoot Moody twice in the back. Second, witness Eloise Jones (the victim's aunt) also selected Hutson's photo from an array and stated that he was the man she saw sitting on a blue bicycle near the site of the killing just before Moody's death. Jones testified to the same effect at Hutson's trial. Third, the circumstances of Hutson's arrest served to incriminate him. On June 14, 1983, Jones told police that an anonymous caller had informed her that a man named "Mustafa" was near the intersection of 28th and Huntington Streets and that Mustafa was Moody's killer. Detectives drove to that location, and saw Hutson, who was riding a blue ten-speed bicycle. As the detectives approached Hutson, he threw away a clear plastic bag. The bag contained gun parts that later testing showed could have been

2

from the type of gun that fired the fatal shots. Sitting in the detectives' car after his arrest, Hutson told the detectives that he used the name Mustafa.

Each source used to convict Hutson was imperfect, however. Rainey stated that he wasn't really paying attention to the man he saw kill Moody, failed to identify Hutson at a preliminary hearing, and had to be corrected from the stand. Jones, who did not actually see the shooting, initially picked out a different man from a photo array. The gun parts could have been from a gun that fired the fatal shots, but the ballistics results were not conclusive.

Nonetheless, a jury convicted Hutson, and on December 21, 1987, the Superior Court affirmed his conviction on direct appeal. Hutson did not seek allocatur from the Pennsylvania Supreme Court. On March 23, 1998, the Court of Common Pleas denied Hutson's petition for state collateral review under the Pennsylvania Post Conviction Relief Act, 42 PA. CONS. STAT. § 9541 et seq. (2007). The Superior Court affirmed this denial on June 28, 1999.

On December 15, 2000, Hutson filed the instant petition, asserting over thirty different claims. All but three of these were procedurally defaulted, either because Hutson did not seek review of his direct appeal from the Pennsylvania Supreme Court or because he did not raise them at all in any state court proceedings. The Magistrate Judge who first heard this petition decided that the non-defaulted claims were meritless, but held an evidentiary hearing on Hutson's actual innocence claim. Ultimately, however, the Magistrate Judge recommended, as explained in two thorough opinions, that Hutson's

3

petition be denied because he did not demonstrate that his imprisonment constituted a fundamental miscarriage of justice. The District Court adopted the Magistrate Judge's recommendation, and denied Hutson's petition on March 29, 2004.

We granted a certificate of appealability limited solely to the question of "whether the District Court erred in concluding that the appellant has not met the 'fundamental miscarriage of justice' standard with regard to his defaulted claims." (JA 152.)

## II.

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 2241, 2254; we have jurisdiction pursuant to 28 U.S.C. §§ 1291, 2253. "We exercise plenary review over the District Court's legal conclusions in a habeas proceeding and apply a clearly erroneous standard to factual findings in dispute." Werts v. Vaughn, 228 F.3d 178, 191 (3d Cir. 2000).

"Out of respect for the finality of state-court judgments federal habeas courts, as a general rule, are closed to claims that state courts would consider defaulted. In certain exceptional cases involving a compelling claim of actual innocence, however, the state procedural default rule is not a bar to a federal habeas corpus petition." House v. Bell, — U.S. —, 126 S. Ct. 2064, 2068 (2006). To prevent a miscarriage of justice, a petitioner may assert that he is actually innocent as a "gateway" to consideration of the merits of defaulted claims. See Schlup v. Delo, 513 U.S. 298, 327 (1995). The petitioner "must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" House, 126 S. Ct. at

4

2076-77 (quoting Schlup, 513 U.S. at 327). The Supreme Court has emphasized that this standard "is demanding and permits review only in the extraordinary case." Id. at 2077 (quotation marks omitted). Indeed, "in the vast majority of cases, claims of actual innocence are rarely successful." Schlup, 513 U.S. at 324.

III.

Hutson offers three categories of evidence in support of his petition. First is alibi evidence that purports to place him inside the Walton Elementary School at the time of Moody's death. Hutson ran a lunch truck outside of Walton, and his daughter Yanna Ballard attended the school. Jerry Salters, Walton's principal, told police investigators that on May 19, he saw Hutson inside the school at about 11:30 a.m., and then again in the school yard at about 1:00 p.m. Because the murder took place between 12:30 p.m. and 1:00 p.m., Hutson argues that Salters' statement means he could not have shot Moody. But Salters also told the police that he couldn't be sure that the day he saw Hutson was actually May 19. It was this uncertainty that caused Hutson's lawyer not to call Salters as a witness at trial, and this uncertainty is plausible because Hutson worked right outside Walton, and so would presumably be in the vicinity on most days. Moreover, even if Salters did see Hutson on May 19 at the times he said, this statement is not the kind of "compelling" or "exceptional" evidence needed to make out an actual innocence claim. Hutson still could have shot Moody at 12:30 p.m. and have been back

5

to the school (about .8 mile from the crime scene) by 1:00 p.m.[1]

Cynthia Carolina, who worked for Hutson at the lunch truck, also said that she saw Hutson enter the school on May 19, at about noon, and then saw him again in the school yard at about 1:00 p.m. Carolina said that she knew Hutson went into the school on May 19 because it was his daughter's birthday that day. In fact, however, Hutson had two daughters, only one of whom (Ballard) attended Walton. May 19 was not Ballard's birthday – it was the other daughter's birthday. Most importantly, Ballard herself testified that she did not see Hutson at school around noon on May 19. Instead, she saw him only in the morning, at about 9:00 a.m. Therefore, as the Magistrate Judge found, Ballard's testimony contradicted Carolina's, and deprived Carolina's account of much credibility.

Second, Hutson points to the testimony of Daniel Marsh and Darrell Williams as evidence that another perpetrator committed the murder. Each testified at the Magistrate Judge's evidentiary hearing that they saw a man on a bike near the corner of 23rd and Clearfield Streets around the time of the killing, but that the bike rider was not Hutson.

Marsh testified that at about 12:10 p.m. on May 19, he went to a barber shop on the corner of 23rd and Clearfield Streets. He saw two men near the intersection: Moody and a man on a blue bicycle. He did not see anyone else nearby. The shop was open, and Marsh got a haircut. At about 12:40 p.m., Marsh left the shop, talked briefly to Moody,

_____

[1] Unfortunately, by the time the Magistrate Judge conducted his evidentiary hearing, Salters had died.

6

and walked up Clearfield to his home. He did not hear any gun shots – indeed, he did not learn of Moody's death until the next day.

Williams testified that Moody had spent the night of May 18 at Williams' house. Moody was still there when, at approximately 12:20 p.m., Williams left to go to the barber shop. As he walked down Clearfield Street, Williams spotted a man sitting on a blue bicycle – but did not see anyone else on the street. Williams continued to the corner of 23rd Street, but found the barber shop closed. Turning back towards his house, he noticed the man on the bike again. When Williams returned home, Moody was still there. The two spoke briefly, and Moody left. Several minutes later, Williams heard shots and went outside. He found Moody hunched over on a stoop, bleeding heavily.

The testimony of these witnesses, as the Magistrate Judge realized, does not meet the standard required for an actual innocence claim, primarily because the accounts are internally inconsistent. Both Marsh and Williams went to a barber shop at approximately the same time. One found the shop open and got a haircut, but the other found the shop closed. Moreover, as the Magistrate Judge observed, for both witness' stories to be true

> Mr. Williams would have had to have raced at lightning speed to the barber shop, found it to be closed and then raced back to his house and had a conversation with Mr. Moody, all [in] under ten minutes. Mr. Moody would then have had to rush [to] . . . appear in the vicinity of the barber shop, appearing no later than 12:30, encounter Mr. Marsh, who was already in the same area getting a haircut, and have a conversation with him. Mr. Marsh would then have to be completely absent from the area by no later than approximately 12:40 when Mr. Moody was shot, so as not to even hear gunshots. Amazingly, Mr. Marsh and Mr. Williams, despite clearly noticing a man on a bike, would have had to completely miss each other's presence in the same locale.

7

(JA 93 (December 11, 2002 Report & Recommendation at 26)).)

Hutson's final piece of allegedly exculpatory evidence is a transcript from a police radio transmission. He claims that the transcript shows conclusively that he could not have committed Moody's murder. The transcript states that Moody was being transported away from the scene of the crime at 12:47 p.m. Because, according to Hutson, the government has consistently pegged the time of the shooting at 12:50 p.m., based in part on Jones' testimony, the transcript shows that Jones was lying.

But the exact time of the shooting was never an essential part of the government's case. Moreover, as the Magistrate Judge noted in a different context, "the combined trial and evidentiary hearing testimony reveal that the shooting occurred sometime between 12:37 and 12:40 p.m." (JA 93.) This timing is consistent with Moody being on the way to the hospital at 12:47 p.m. Accordingly, the police transmitter transcript is not the kind of compelling evidence Hutson would need to succeed on an actual innocence claim.

IV.

For the foregoing reasons, we will affirm the decision of the District Court in all respects.

8