

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NOS. AP-75,580/75,581

**EX PARTE BILLY FREDERICK ALLEN, Applicant**

**ON APPLICATION FOR A WRIT OF HABEAS CORPUS FROM HARRIS COUNTY**

**HERVEY, J., filed a dissenting opinion in which KELLER, P.J., joined.**

**DISSENTING OPINION**

Unable to agree with the Court's decision that the evidence presented at the habeas hearing "tended to show the existence of a Billy Wayne Allen who was more likely to have been the murderer than applicant who seemed to have no motive at all,"[1] I respectfully dissent.

The police investigation of this crime began in the early morning hours of April 9, 1983, when Officer Clary discovered the bloodied Sewell standing outside his home. At the habeas hearing, Captain Holman described the events leading up to the issuance on that very day of warrants for applicant's arrest and for a search of the motel room where applicant was staying. Holman testified that, based on Sewell's statement to him at the hospital that Billy Allen was involved, the

---

[1]

*See* Lead plurality op. at 17.

police began "checking any and all possibilities of a Billy Allen and came up with several at that time" with one "being a Billy Wayne Allen, the other one being Billy Frederick Allen (the applicant)."[2] Applicant (Billy Frederick Allen) became a suspect after Sewell's ex-wife (Brooksie) identified a photograph of applicant as someone she and Sewell had known during the twelve years that they were married[3] and after applicant's palm print was found on the car where the other murder victim (Lashbrook) was discovered. Based on this information, the police obtained the warrants for applicant's arrest and for a search of the motel room where applicant was staying. When the police

---

[2]

Holman testified that he had no reason to "keep Billy Wayne Allen out of it in order to go after Billy Frederick Allen."

Q. [STATE]: Had you had any prior dealings, Captain, with Billy Frederick Allen?

A. [HOLMAN]: No, ma'am.

Q. Did you even know of his existence?

A. No, ma'am.

Q. Had you any prior dealings with Billy Wayne Allen?

A. No, ma'am.

Q. Did you even know about his existence?

A. No, ma'am.

Q. Is there any reason why you would have wanted to keep Billy Wayne Allen out of it in order to go after Billy Frederick Allen? Did you have some personal reason for this?

A. No, ma'am, not at all.

[3]

It is not clear from Holman's testimony at the habeas hearing whether Brooksie was shown a photograph of Billy Wayne Allen at this time. Holman did testify that Brooksie never indicated that they knew more than one Billy Allen. Brooksie did not testify at the habeas hearing.

attempted to serve these warrants less than 24 hours after their investigation began on April 9, 1983, they discovered that applicant had fled[4] which Holman considered to be an "unusual coincidence."

> Q. [STATE]: Can you describe what time you interviewed [Sewell] in relation to when he was found in the yard?
>
> A. [HOLMAN]: I interviewed him at Presbyterian Hospital at approximately 5 a.m. He was conscious at that time, he was willing to talk. I asked him who had done this to him and some other circumstances surrounding what had happened and at that time he told me it was Billy Allen.[5]

---

[4]

Applicant was arrested about a month later in California.

[5]

This, of course, was consistent with Officer Clary's offense report prepared shortly after he spoke to Sewell and his testimony at the habeas hearing that Sewell also told him at the crime scene that Billy Allen was the one who was involved. Clary also testified at the habeas hearing that he would have had no reason to leave out the middle name of Wayne if Sewell had said it and that he would have reported the complete name that Sewell said because that would have been "more of an identifier for [his] investigator people to work off of."

> Q. [STATE]: Officer Clary, had you ever had any dealings with Billy Frederick Allen, who is the Defendant here today, before this incident?
>
> A. [CLARY]: No, ma'am.
>
> Q. Did you even know a Billy Frederick Allen existed?
>
> A. No.
>
> Q. Did you have any dealings with a person named Billy Wayne Allen before that you can recall.
>
> A. Not to my knowledge, no.
>
> Q. So you are not even sure of a Billy Wayne Allen's existence?
>
> A. I wouldn't know one Billy Allen from the next.
>
> Q. You would have had no reason, Officer, to not report the name Wayne if you had heard it, would you?

Q. And did you interview him or when you spoke to him he was still in the emergency room?

A. That's correct.

Q. Because you had that name, Billy Allen, would you describe now what you did when you got that name and you had a chance to go back and investigate, how did you pursue following to find out which Billy Allen in the whole state it could have possibly been?

A. We–I radioed back to the station when I left Presbyterian Hospital and gave them what information that I had at that time. They began checking any and all possibilities of a Billy Allen and came up with several at that time. One being a Billy Wayne Allen, the other being Billy Frederick Allen. As a matter of fact on Billy Wayne Allen I showed that the computer check was made on him on the date of the offense at approximately 8:30 in the morning so I was full aware of a Billy Wayne Allen at that time.

\* \* \*

Q. What caused you, once you had determined this and you had gotten these fingerprints and these pictures and all of that, what next step did you take to make a determination whether to focus on Billy Wayne or Billy Ray or Billy Frederick?

A. There was really two different indicators in this. One being that the ex-wife of the deceased or about to be deceased Perry Sewell identified Billy Frederick Allen as the Billy Frederick Allen that she and her husband, Perry, knew. The other indicator being that Sergeant Bobby Brown did a positive fingerprint wrap on Billy Frederick Allen.

\* \* \*

Q. So you showed her pictures then?

A. Some time that day, yes.

Q. That's like the next day after the injury. I mean, this was--

A. Well, I had a warrant for the arrest of Billy Frederick Allen by I believe about 9

---

A. I would not have had a reason not to.

Q. It would have been your habit had you heard Billy Frederick or Billy Wayne or Billy Joe or Billy anything to put in the complete name that you heard?

A. Absolutely. That would be more of an identifier for my investigator people to work off of, you bet.

o'clock that night.

Q. I see.

A. I'm only guessing that I gave or showed a photo to Brooksie on that day so–it was a long day.

Q. So she told you that this was the Billy Allen that they knew?

A. Yes.

Q. Billy Frederick Allen?

A. Yes.

Q. She didn't say this is the Billy Frederick Allen we know, this is the Billy Allen we know?

A. This is the Billy Allen we know, yes.

Q. Do you remember if you showed her a picture of Billy Wayne Allen as part of that photo lineup?

A. I do not know.

Q. Did she ever indicate to you that they knew several Billy Allens or at least two Billy Allens and the other one was someone else?

A. She did not indicate that, no.

* * *

Q. Was there anything else in your investigation of this case, Captain, that you felt further convinced you that this was indeed the correct man, Billy Frederick Allen, who committed this crime?

A. On the night of the incident, I secured a search warrant for an apartment complex or a motel complex where I thought Billy Allen was in fact staying. And with the assistance of the Dallas Police Department we ran the search warrant and found that he had fled and later was found in California. It was strange that he fled Texas that night.

Q. An unusual coincidence--

A. Yes, ma'am.

Q. –that he left that night for California.[6]

In addition to the live testimony at the habeas hearing of the paramedic (Castle) that he heard Sewell name Billy Wayne Allen in the ambulance as his attacker,[7] the other post-conviction evidence presented at the habeas hearing consists primarily of a polygraph examination regarding the Sewell murder that applicant "failed"[8] and of many years-old, uncross-examined hearsay statements in affidavits from several people involved in the drug trade (Taylor, Winkles, Craig and Cook) none of whom testified at the habeas hearing and whose availability to testify at any retrial of applicant appears to be seriously doubtful. The affidavits of Taylor, Winkles and Craig indicate that Sewell may have known a Billy Wayne Allen. The only affidavit that really connects a Billy Wayne Allen to this case is a July 1984 affidavit from a convict named Cook in which Cook stated that he saw a Billy Wayne Allen with some of Lashbrook's property shortly after the murders at which time, according to Cook, this Billy Wayne Allen also made statements to Cook connecting him to the murders. *See* Lead plurality op. at 17 n.24 (describing some of the contents of Cook's affidavit).

But this Court should consider it highly problematical to rest any of its decision to overturn these 25-year-old murder convictions based on the uncross-examined hearsay statements in Cook's

---

[6]

Evidence was also presented at the habeas hearing that a federal lawsuit that applicant filed against "everybody" involved in the investigation and prosecution of this case came to nothing. Applicant apparently was unable to raise a serious question of his innocence in federal court.

[7]

The evidence at the habeas hearing seems to indicate that Castle testified that no police officers (particularly Clary) were present when Sewell named Billy Wayne Allen as his attacker.

[8]

This polygraph report also states that applicant "would not submit himself for more testing [on the Lashbrook murder] until he got authorization from his attorney." The habeas record contains no evidence that applicant has submitted to further polygraph testing.

1984 affidavit in light of other evidence presented at the habeas hearing. *See Schlup v. Delo*, 513 U.S. 298, 329 (1995) ("actual innocence" standard requires courts to "make a probabilistic determination about what reasonable, properly instructed jurors would do").[9] For example, the evidence from the habeas hearing indicates that Cook wanted a "deal" for leniency on charges pending against him in exchange for his testimony suggesting that a Billy Wayne Allen committed the murders.[10] More problematical is the evidence that even applicant considered Cook to be a "space cadet" with little credibility apparently because there was not much left of Cook's brain after all of the drugs he had ingested over the years. For example, a state investigator (Lucas) testified:

> Q. [STATE]: May I ask what was your opinion of Mr. Cook's interest in this case and why was he making these statements?
>
> A. [LUCAS]: Well, it is not uncommon for inmates to either take cases off of individuals or to fabricate stories to help prisoners. My review with Clifford Cook, I felt the man had either injected too many drugs or maybe ingested too much

---

[9]

*See also* Article 11.07, § 4(a)(2), TEX. CODE CRIM. PROC., (prohibiting consideration of merits of subsequent habeas corpus application "unless the application contains sufficient specific facts establishing that by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt"); *Brooks v. State*, 219 S.W.3d 396, 399-400 (Tex.Cr.App. 2007) (Article 11.07, § 4(a)(2), is essentially a legislative codification of Supreme Court's decision in *Schlup*); Concurring op. at 2-4 (Price , J., concurring) (applicant's post-conviction claims should be analyzed under Article 11.07, § 4(a)(2)).

[10]

Apparently in response to Cook's July 1984 affidavit, Holman made an affidavit in October 1984 in which, among other things, he stated:

> In June or July 1983 I interviewed Clifford E. Cook in the Tarrant County jail. Cook had been arrested on some type of narcotics charge and wanted me to guarantee him a deal. I made no deal with him and told him that any information that he gave me would be furnished to the Dallas County District Attorney. I did not suppress any evidence that he furnished me and turned all the information over to the Dallas County District Attorney to be used or not at his discretion. I did not receive any information favorable to the defense of Billy Frederick Allen. During the interview, Cook was unable to give me any information about the killing of Lashbrook.

alcohol. I felt that his brain was deteriorated. And even when I talked to [applicant] at TDC [applicant] told me that in his opinion Cook was a space cadet. That was his exact words. I kind of concurred with that, that Cook was somewhat–his brain had been kind of dissolved away over the years, many years.

Q. As a matter of fact I think [applicant's lawyer] wrote you a letter in which he indicated that he was not going to pursue the Clifford Cook route of testimony just because of the credibility question?

A. I think that's correct. I don't have a copy of that letter in front of me but I think that's correct.[11]

On this record, I would decide that applicant has not established that his 25-year-old murder convictions should be overturned even under the most generous standard for evaluating applicant's post-conviction claims. I do not believe that applicant's post-conviction evidence establishes even a reasonable doubt about his guilt. *See Schlup*, 513 U.S. at 329 (meaning of "actual innocence" does "not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty"). For the reasons set out above, no properly instructed rational jury would believe anything that the "space cadet" Cook might testify to.[12] *See Schlup* 513 U.S. at 329 (it is not a court's "independent judgment as to whether a reasonable doubt exists that the ["actual innocence"] standard addresses," rather the standard

---

[11] Applicant's lawyer did not dispute at the habeas hearing that Cook is a "strange dude."

Q. [APPLICANT'S LAWYER]: And you did a lot of work over a period of eight or nine months. You came to Austin several times, interviewed Mr. Cook who we all–is definitely a strange dude?

A. [LUCAS]: Strange person.

Q. We do not dispute that.

[12] This assumes that Cook would say the same thing at a retrial of applicant in 2009 that he said 25 years ago in his 1984 affidavit.

requires courts "to make a probabilistic determination about what reasonable, properly instructed jurors would do").

In addition, it is just as likely that a rational jury would believe that Sewell did not name a Billy Wayne Allen in the ambulance as his attacker. *See id.* Two officers (Clary and Holman), with absolutely no motive to state otherwise, reported on the day of the incident on April 9, 1983, that Sewell named Billy Allen as his attacker. It is highly unlikely that Sewell would name Billy Allen to both of these officers but add Wayne in the ambulance. In addition, a rational jury could reasonably have convicted applicant even if it somehow believed Castle's testimony that Sewell did name a Billy Wayne Allen in the ambulance as his attacker. *See Schlup*, 513 U.S. at 329 (it is not a court's "independent judgment as to whether a reasonable doubt exists that the ["actual innocence"] standard addresses," rather the standard requires courts "to make a probabilistic determination about what reasonable, properly instructed jurors would do" and a post-conviction applicant "does not meet the threshold ["actual innocence"] requirement unless he persuades the [courts] that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt"). I believe that the attorney, who prosecuted this case, persuasively explained at the habeas hearing how the "one little glitch of Billy Wayne Allen is really meaningless" in this case.

Q. [STATE]: What do you think about this?

A. [THE PROSECUTOR]: I think beyond any question that Billy Frederick Allen killed Raven Danelle Lashbrook and James Perry Sewell beyond any question.

Q. What do you think about Mr. Castle [the paramedic who claimed to have heard Sewell name Billy Wayne Allen as his attacker]?

A. I don't know. I really don't know what to think about that. I assume

you're–you've had some number of years in criminal practice and you know that in trials and just in life in general there are things that you just can't explain, things that just happen that you can't explain. And that–that's the best I can do for you. This is just something–I don't have any idea. I certainly don't think that Castle is making it up. I think it is possible he could be mistaken. I think there are any number of possibilities but even assuming that what he said was the God's truth and it happened exactly the way he said it happened that doesn't put the smallest dent in my conviction that Billy Frederick Allen is guilty just like the jury found him guilty.

Q. Would that be the case even though you had known about a Billy Wayne Allen that had connections with Perry Sewell?

A. It certainly would have made a difference in the way we approached the case. I mean, I guarantee you we would have gone out and we would have hunted up a Billy Wayne Allen. And assuming–there probably are three or four Billy Wayne Allens in the State of Texas that are skunks and we would have probably gone out and tried to account for each one of them and figure out who they are and where they were when it happened.

But in the context of all of the other facts in this case and just a few that I know off the top of my head, Billy Frederick Allen's fingerprints on the roof of that Cadillac just where his hand would have been when he reached through with a pistol to shoot Raven Dannelle Lashbrook, the fact that he left town the very night the murders occurred, and certain other facts, the fact that he had a long-standing relationship with James Perry Sewell, et cetera, et cetera, that one little glitch of Billy Wayne Allen is really meaningless in my opinion.

Judge Cochran's concurring opinion states that, in granting applicant a new trial, the Court is "merely accepting" the habeas court's "factual findings and credibility assessments" and that it is "largely irrelevant that the record contains other, conflicting facts or that other credibility assessments could be made by a different factfinder." *See* Concurring op. at 1 (Cochran, J., concurring). But, it is actually the habeas court's own "factual findings and credibility assessments" that are largely irrelevant to the legal determination that the Court is required to make in these "actual innocence" cases. *See Schlup*, 513 U.S. at 329-32. As the Supreme Court carefully explained in *Schlup*,

> The meaning of actual innocence . . . does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty. **It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do**. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror; acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

*See Schlup*, 513 U.S. at 329 (emphasis supplied).

Unlike other habeas corpus cases that come before this Court, the legal question to decide in these "actual innocence" cases is not whether the habeas court itself would convict but rather whether no rational jury would have convicted in light of the new evidence. *See id*.[13] And, in making this determination, I believe that it is very relevant "that the record contains other, conflicting facts or that other credibility assessments could be made by a different factfinder." *See id*. ("actual innocence" standard does not address "district court's independent judgment as to whether reasonable doubt exists" but requires "a probabilistic determination" about what rational jurors would do) and *id*. at 330 ("actual innocence" standard "focuses the inquiry on the likely behavior of the trier of fact" and requires a consideration of "what reasonable triers of fact are likely to do"). I would decide that applicant's post-conviction evidence does not establish any probability that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *See Schlup*, 513 U.S. at 329. Because the Court overturns applicant's 25-year-old murder convictions

---

[13] In this case, for example, the issue is not whether the habeas court believed Castle's testimony that Sewell named Billy Wayne Allen as his attacker. The issue is whether "no rational juror" would have convicted applicant in light of this evidence. *See Schlup*, 513 U.S. at 329. And I believe that the record in this case clearly reflects that a rational juror would still have convicted applicant even with Castle's testimony.

based on one meaningless little glitch and uncross-examined, 25-year-old hearsay from a burned-out

space cadet looking to make a deal, I respectfully dissent.

Hervey, J.

Filed: February 4, 2009
Do Not Publish