[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-11285
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 7, 2010
JOHN LEY
CLERK

D.C. Docket No. 3:07-cv-00189-MMH-TEM

ERIC GEAROD SCARLETT,

Petitioner-Appellant,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,
FLORIDA ATTORNEY GENERAL,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(December 7, 2010)

Before EDMONDSON, HULL and PRYOR, Circuit Judges.

PER CURIAM:

Eric Gearod Scarlett, a Florida prisoner, appeals the dismissal of his 28

U.S.C. § 2254 federal habeas petition. The district court concluded Scarlett's petition was untimely under the one-year statute of limitations in 28 U.S.C. § 2244(d)(1). After review, we affirm.

## I. BACKGROUND

### A. State Armed Robbery Conviction

In Florida state court, Scarlett and two co-defendants, Keith Wilson and Keith Robbins, were charged with armed robbery in 1991. According to the government's trial evidence, two men robbed a Jacksonville convenience store at gunpoint on November 9, 1990, at about 1:00 a.m. The man carrying the gun wore a ski mask. Catherine Law, the store clerk, described the man in the ski mask as six feet tall, very skinny," and "olive complected." He had long arms and long skinny hands, dark eyes and a "braided tail." The second man, who was white, was shorter and wore a bandana that kept falling off his face.

As the two robbers ran out of the store, witness Troy Pittman pulled up in his car. Pittman saw that one robber was wearing a ski mask. The robbers got in a white Honda Civic, which had a third man already in it, and drove away. Pittman chased the Honda in his car. After someone in the Honda fired shots, Pittman rammed the Honda and drove by as the Honda went into a ditch that was muddy and full of water.

2

Around 2:00 a.m., Rachael Highsmith and a co-worker were driving to get something to eat. Highsmith saw Scarlett, whom she had met before, walking with Keith Wilson. Scarlett and Wilson flagged Highsmith down for a ride. When the two men got in the back seat, Highsmith noticed they were wet. Scarlett told Highsmith they had been at a bar and that another man, Keith Robbins, was supposed to pick them up but did not show. The men appeared anxious and in a hurry.

Highsmith took them to a house where they said they lived. As she drove away, Highsmith passed a white Honda Civic in a ditch. Highsmith recognized it as Keith Robbins's car. Highsmith and her coworker later went to the convenience store, where they talked to police.

Officer Michael John Krivensky responded to the armed robbery call and was diverted to the white Honda Civic in the ditch. Officer Krivensky looked inside the car and saw a ski mask. This ski mask was introduced into evidence, along with pictures of the Honda in the ditch. Officer Krivensky was dispatched to arrest Robbins. A few hours later, Robbins gave a written confession implicating Scarlett and Wilson.

Later, at about 5:00 a.m., Officer Krivensky was dispatched to Scarlett's home, where he found and arrested Scarlett and Keith Wilson. At the time,

3

Scarlett had a "little tail that protruded down the back of his neck."  Officer Krivensky saw two pairs of wet blue jeans in a hamper and saw that Scarlett's wallet was wet.  Officer Krivensky took Scarlett and Wilson to the convenience store to see if store clerk Law could identify them.

At trial, Law testified that one of the two men the police brought to her fit the description she gave the police of the ski-masked robber, as he was tall, very slender and had distinctively long arms, the same brown eyes and the same "tail." According to Law, Scarlett resembled the man in the ski mask because he was the same height, had the same skinny build and long skinny hands and had an olive skin tone.  The state trial court instructed Scarlett to put on the ski mask.  After Scarlett complied, Law stated that Scarlett looked like the armed robber. However, Law admitted that she could not make a positive identification.

At trial, both Keith Wilson and Keith Robbins testified that they robbed the convenience store with Scarlett.  Wilson testified that he and Scarlett went into the convenience store, while Robbins waited in the car.  Scarlett wore a ski mask and was carrying the gun, which belonged to Robbins.  Wilson rolled up a shirt and tied it across his face, but it kept falling down.  Afterward, as they drove away, another car followed them.  After Robbins fired shots at the following car, the car rammed into their car, sending it into a ditch.

4

Wilson fled with Scarlett. Their clothes were muddy and wet. They took off their shirts and threw them away. While they hid in the woods and watched police cars drive by, Scarlett told Wilson that, if they were questioned by the police, they should say that Keith Robbins left them at a bar. Wilson flagged down a girl named Rachael, who gave them a ride to Scarlett's house.

Robbins testified that he waited in the car while Scarlett and Wilson robbed the store. Scarlett carried Robbins's gun and wore a black ski mask that belonged to Robbins's roommate. Robbins admitted that he fired shots out the window at Troy Pittman's car as they fled.

Scarlett called Reginald Leon Lott, an officer with the Jacksonville Sheriff's Office. Lott was the first officer at the robbery scene and prepared the incident report. Officer Lott acknowledged that Law initially described the robber wearing the ski mask as a white male.

Scarlett also called Maudene Topolski, a bartender at Dean's Chuck Wagon. Topolski described Dean's Chuck Wagon as a "red neck bar" frequented mostly by white customers. Topolski recalled a tall, thin black man coming into the bar in early November to play pool with two white men. Topolski said the man stayed in the bar from 8:30 p.m. until it closed at 2:00 a.m. Topolski identified the man as Scarlett. Topolski's husband, David Topolski, testified that Scarlett came into the

bar sometime before Christmas, but he could not recall the exact date. Scarlett did not present any DNA evidence during the trial.

On April 17, 1991, the jury found Scarlett guilty. As a habitual violent felony offender, Scarlett received a mandatory life sentence. On October 8, 1992, Scarlett's conviction was affirmed on direct appeal.

## B. First DNA Testing

On June 21, 2001, Scarlett filed a motion for release of evidence for DNA testing. Scarlett sought to have Dr. Suhir K. Sinha of ReliaGene Technologies, Inc., perform DNA tests on the gun and the ski mask using cutting-edge DNA analysis developed within the last two years. Scarlett attached an affidavit from Dr. Sinha, who opined that there was a "strong possibility of successful DNA analysis on the mask and gun to determine if Mr. Scarlett can be excluded as the robber based on DNA material found on the mask and gun." Dr. Sinha listed three new DNA testing methods his lab could use, including "Thirteen CODIS STR Loci," "Mitochond[ri]al DNA Sequence," and "Y-STR analysis."

On April 25, 2002, the state court granted Scarlett's motion. ReliaGene Technologies performed DNA testing and prepared a July 13, 2002 report. According to the 2002 report, the lab analyzed five cuttings from the ski mask and tested possible sweat from different areas of the mask. The 2002 report concluded

6

that: (1) three samples produced no results due to insufficient or excessively degraded DNA; (2) Scarlett was excluded as the DNA donor from the sample cut from the mask around the bridge of the nose; and (3) the fifth sample, "Sample #02-4506E," from approximately the mouth area of the mask, provided consistent results with Scarlett and at least two other donors. The 2002 report concluded that Scarlett was "not excluded as a DNA donor" with respect to the fifth sample.

## C. First Rule 3.850 Post-Conviction Motion

On January 7, 2004, Scarlett filed his first post-conviction motion pursuant to Florida Rule of Criminal Procedure 3.850. Scarlett attached a copy of Dr. Sinha's DNA report and argued that the outcome of his trial would have been different had the jury seen the DNA evidence.

On January 27, 2004, the state trial court denied Scarlett's Rule 3.850 motion. The court determined that there was "no reasonable probability" that Scarlett would not have been convicted or would have received a lesser sentence had the DNA evidence been admitted at trial. On July 15, 2004, Florida's First District Court of Appeals affirmed. See Scarlett v. State, 892 So.2d 1019 (Fla. 1st Dist. Ct. App. 2004) (Mem.).

## D. Second DNA Testing

On August 18, 2005, Scarlett obtained a sworn statement from Dr. Sinha

explaining that the DNA test he performed in 2002, the Autosomal STR DNA test, tests 13 DNA markers. Another DNA test, the Y-STR DNA test, (which Dr. Sinha did not perform in 2002) examines markers on the Y chromosome. The Y-STR DNA test is useful to discriminate between different, non-related males when there is a mixture of DNA and to determine whether each male is a major or minor DNA contributor. Dr. Sinha stated that an improved version of the Y-STR DNA test was recently released which tested 16 different Y chromosome markers, allowing for better discrimination between male DNA donors.

Dr. Sinha explained that while the nose bridge sample had a "very clear profile with high, high DNA content" from another individual, the result from Sample #02-4506E was very weak, contained only a very small amount of Scarlett's DNA, and identified at least two DNA donors. Dr. Sinha explained that the result for Sample #02-4506E was not a positive identification of Scarlett, but "a very weak possibility" that he was one of the three DNA donors differentiated during the testing. Dr. Sinha opined that Scarlett's DNA found in Sample #02-4506E could have come from Scarlett wearing the ski mask momentarily during the trial.

On March 3, 2006, Dr. Sinha's lab prepared a second DNA report indicating that the five samples from the ski mask were subjected to additional testing using

8

the "Y-filer Y-STR Multiplex" test. Based on this additional testing, the 2006

DNA report concluded that: (1) the two samples taken from the nose bridge area

were consistent with a single male DNA donor, but not consistent with Scarlett's

DNA, excluding Scarlett as the DNA donor; (2) the "Quantifiler Y Male DNA

Quantification system . . . failed to reveal the presence of amplifiable male DNA in

. . . Sample #02-4506E";[1] (3) a "clear profile of a male DNA donor was

consistently detected in all tested areas of the ski mask," prompting Dr. Sinha to

"strongly recommend[]" that this DNA profile "be searched against the CODIS

database or additional reference samples to identify the unknown donor."

## E.     Second Rule 3.850 Post Conviction Motion

On May 26, 2006, Scarlett filed a second Rule 3.850 motion. Scarlett

argued that the state court had misinterpreted the 2002 DNA report and that Dr.

Sinha since had performed the 2006 DNA test on the ski mask using new DNA

testing technology. Scarlett attached Dr. Sinha's August 18, 2005 sworn statement

and the March 3, 2006 DNA report prepared by Dr. Sinha's lab.

Additionally, Scarlett attached a March 28, 2006 sworn statement, in which

---

[1]The 2006 DNA report noted that the 2002 DNA test had found a mixture of at least three DNA donors on sample #02-4506E and that the "frequency of the profiles that could have contributed to this mixture is 1 in 23 Caucasian individuals, 1 in 20 Black individuals, and 1 in 51 Hispanic individuals." The 2006 DNA report cautioned that, "[d]ue to the low level nature of this area of the ski mask, it is our considered scientific opinion [that] the strength of the evidence is very weak and these results should be used accordingly."

Dr. Sinha stated, <u>inter alia</u>, that: (1) the 2006 DNA test used the "Y-STR DNA test," which was "very sensitive," the "newest forensic test available" and better for mixed DNA samples; (2) the new test kit for the Y-STR DNA test was released at the end of 2004, but had to go through an evaluation period in each lab to make sure it worked correctly, such that it was implemented toward the end of 2005; (3) the 2006 DNA test excluded Scarlett from the samples from the nose bridge area of the ski mask; (4) although the test results for the mouth area of the ski mask showed at least three DNA donors and did not exclude Scarlett, the strength of this evidence was very weak, involved a very low amount of DNA, and "include[s] a lot of people"; (5) the DNA sample that did not exclude Scarlett could have been the result of his momentarily donning the mask during the trial; and (6) the DNA results clearly pointed to someone else who "used this ski mask more" and that person's DNA profile should be placed in the police database to discover to whom the ski mask belonged.

On June 12, 2006, the state trial court dismissed Scarlett's second Rule 3.850 motion as a successive motion that failed to allege new or different grounds for relief. <u>See</u> Fla. R. Crim. P. 3.850(f). On July 15, 2004, the First District Court of Appeals affirmed. <u>See</u> <u>Scarlett v. State</u>, 944 So.2d 990 (Fla. 1st Dist. Ct. App. 2006) (Mem.).

10

**F.** **28 U.S.C. § 2254 Petition**

On March 19, 2007, Scarlett filed this § 2254 petition arguing newly discovered DNA evidence required that his conviction and sentence be vacated. Scarlett also asserted that the new DNA evidence established a separate claim of actual innocence. Scarlett maintained that his § 2254 petition was timely because it was filed "within less than 90 days of the [January 3, 2007] mandate of the state court of appeals affirming the denial of Scarlett's state DNA motion."

In response, the State argued that Scarlett's § 2254 petition was untimely because the one-year limitations period, 28 U.S.C. § 2244(d)(1)(D), ran on April 24, 1997. The State argued, <u>inter alia</u>, that the DNA testing did not restart the one-year limitations period because DNA testing had been available for years and the factual predicate for Scarlett's DNA claim could have been discovered years earlier.

In reply, Scarlett argued that his § 2254 petition was timely because it relied on "the most recent, cutting edge forensic DNA testing" which was available less than one year. Scarlett also contended that accepting the State's position presented a Suspension Clause issue.

The district court dismissed Scarlett's § 2254 petition with prejudice. The district court found that the one-year limitations period for filing Scarlett's DNA

11

claim began on July 13, 2002, the date of the first DNA report, and the one-year period elapsed before Scarlett filed his first Rule 3.850 motion.  The district court concluded that Scarlett did not show that equitable tolling was warranted.

As to Scarlett's actual innocence claim, the district court determined that Scarlett's DNA evidence failed to show actual innocence such that the one-year limitations period should not be applied.  The district court explained that, even if the DNA evidence established that a third person wore the ski mask, there was "overwhelming evidence that Scarlett was the ski-masked robber."  The facts that Scarlett was a minor DNA donor and another male was a major DNA donor were consistent with the trial testimony that the ski mask belonged to co-defendant Robbins's roommate.  Thus, the DNA evidence did not exonerate Scarlett, but rather "reflect[ed] that other(s) wore the ski mask," which was consistent with the fact that Scarlett did not own the mask or possess it before or after the robbery.

In the same order, the district court granted a certificate of appealability on the issue of "whether the federal Petition is timely under 28 U.S.C. § 2244(d)(1)(D), which permits filing within one year from 'the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.'"  Scarlett filed this appeal.

## II.  DISCUSSION

12

## A. Section 2244(d)(1) Limitations Period

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a one-year statute of limitations for filing a federal habeas corpus petition. 28 U.S.C. § 2244(d)(1); Pace v. DiGuglielmo, 544 U.S. 408, 410, 125 S. Ct. 1807, 1810 (2005). This one-year period begins on the latest of four dates. 28 U.S.C. § 2244(d)(1). The triggering date that applies here is "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D).

"The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." Id. § 2244(d)(2). However, once the limitations period expires, no state collateral proceedings filed thereafter will toll the statute of limitations "because there is no period remaining to be tolled." Tinker v. Moore, 255 F.3d 1331, 1333 (11th Cir. 2001) (quotation marks omitted). In addition, "§ 2244 permits equitable tolling when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable with diligence." Id. (quotation marks omitted). If a Rule 3.850 motion "produce[s] newly discovered exculpatory evidence, AEDPA grants the movant a year from that

13

discovery, subject to tolling while related state collateral attacks are advanced, to challenge their conviction in federal habeas proceedings." Brown v. Sec'y for Dep't of Corr., 530 F.3d 1335, 1338 (11th Cir. 2008) (citing 28 U.S.C. § 2244(d)(1)(D)).[2]

## B. Scarlett's § 2254 Petition

We agree with the district court that the factual predicate for Scarlett's DNA claim could have been discovered through the exercise of due diligence as of July 13, 2002, the date of the first DNA report. The 2002 DNA report put Scarlett on notice that the ski mask contained DNA from both Scarlett and at least two other unknown donors. More than one year (543 days) passed after July 13, 2002 before Scarlett filed his first Rule 3.850 motion on January 7, 2004.[3] Because by that time the one-year limitations period had already expired, there was nothing left to toll. See Tinker, 255 F.3d at 1333-34.

We reject Scarlett's argument that the 2006 DNA report was a new factual predicate that could not have been discovered earlier with due diligence and that thus restarted the one-year clock. As the district court explained, in light of the

[2]We review de novo the district court's determinations that a petition for federal habeas corpus relief is time-barred under § 2244(d) and that the limitations period was not tolled. Steed v. Head, 219 F.3d 1298, 1300 (11th Cir. 2000).

[3]Although the district court states that Scarlett filed his first Rule 3.850 motion on January 6, 2004, the copy of the motion in the record is stamped filed January 7, 2004.

results of the 2002 DNA report, the 2006 DNA report did not constitute "newly discovered exculpatory evidence." See Brown, 530 F.3d at 1338. The 2002 DNA report indicated that sample #02-4506E contained DNA consistent with Scarlett's and at least two other individuals, such that Scarlett could not be excluded as a DNA donor for that sample. Dr. Sinha performed the 2006 DNA test, the Y-STR DNA test, in hopes that the DNA mixture could differentiate between the different male DNA profiles to the point that Scarlett could be excluded. However, as to sample #02-4506E, the 2006 DNA test "failed to reveal the presence of amplifiable male DNA in the remaining DNA extract." In other words, the 2006 DNA test did not exclude Scarlett as a DNA donor either.

Dr. Sinha stressed that the 2006 DNA test failed to exclude roughly five percent of the black and caucasian population and, thus, was very weak evidence. Although this fact suggests the DNA evidence is not particularly inculpatory, it does not mean the new DNA evidence is exculpatory. Likewise, the facts that some other male was the major DNA donor and Scarlett was a minor DNA donor are consistent with the trial evidence that the ski mask belonged to co-defendant Robbins's roommate and that Scarlett only borrowed it for the robbery. The district court did not err in concluding that Scarlett's § 2254 petition was untimely

15

under § 2254(d)(1)(D).[4]

## C.    Actual Innocence Claim

"To successfully plead actual innocence, a petitioner must show that his conviction resulted from 'a constitutional violation.'" Johnson v. Fla. Dep't of Corr., 513 F.3d 1328, 1334 (11th Cir. 2008) (quoting Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 851, 867 (1995)).  The actual innocence claim in Schlup is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Schlup, 513 U.S. at 315, 115 S. Ct. at 861 (quotation marks omitted).

To be credible, a claim of actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Id. at 324, 115 S. Ct. at 865. The petitioner "must demonstrate that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," and "must

---

[4]There is some evidence in the record to suggest Scarlett was not diligent in pursing this DNA evidence.  Dr. Sinha's March 28, 2006 sworn statement indicates that the latest version of the Y-STR DNA test became available in 2005.  However, it appears an earlier version of this test was available as early as June 21, 2001, when Scarlett filed his motion for release of evidence for DNA testing.  Dr. Sinha's affidavit attached to that 2001 motion identified the "Y-STR analysis" as one of three possible tests that could be performed on the ski mask.

raise sufficient doubt about his guilt to undermine confidence in the result of the trial." Johnson, 513 F.3d at 1334 (quotation marks and alteration omitted). We have recognized that "actual innocence" means "factual innocence, not mere legal insufficiency." Id. (quotation marks and alteration omitted).

Here, the trial evidence amply supported the fact that Scarlett was the robber who wore the ski mask. Scarlett's two co-defendants testified that they robbed the store with Scarlett and that Scarlett was the one who wore the ski mask and carried the gun. The co-defendants' testimony of what transpired that night – from the robbery to their flight and ultimate arrest – was corroborated by other witnesses.

The store clerk, Law, testified that Scarlett resembled the robber wearing the ski mask and holding the gun, noting that Scarlett was the same height and had the same skinny build and olive skin tone. On the night of the robbery, Scarlett was wearing a braid down his neck like Law described to police. The robbers fled in a white Honda Civic that was later determined to belong to co-defendant Robbins.

Witness Pittman ran the robbers' Honda into a ditch filled with muddy water. Shortly thereafter, Highsmith picked Scarlett and Wilson up on the side of the road. The two men were wet and behaving anxiously. The story they told Highsmith was consistent with the story co-defendant Wilson said Scarlett concocted for them just after the crash in case they encountered the police. Upon

arrival at the ditch, Officer Krivensky saw a ski mask inside the Honda. Several hours later, when arresting Scarlett and Wilson, Officer Krivensky found two pairs of wet jeans in the hamper and Scarlett's wallet, which was also wet.

As already discussed, the DNA evidence did not exclude Scarlett as a DNA donor with regard to the ski mask. The DNA evidence indicates that there were several male DNA donors, and that Scarlett was a minor donor and another male was a major donor. This evidence is consistent with evidence that Scarlett borrowed the ski mask from co-defendant Robbins's roommate for the robbery. Because this DNA evidence was not exculpatory or inconsistent with the other overwhelming evidence that Scarlett wore the ski mask during the robbery, we cannot say that this evidence would likely change the result of the trial. We agree with the district court that Scarlett did not meet his burden to show that it is more likely than not that no reasonable juror would have found Scarlett guilty beyond a reasonable doubt. Accordingly, Scarlett has not made a sufficient showing of actual innocence.[5]

**AFFIRMED.**

---

[5]Because Scarlett failed to show actual innocence, we need not, and do not, address the constitutional issue of whether the Suspension Clause requires that an actual innocence claim operate as an exception to AEDPA's one-year limitations period. See Johnson, 513 F.3d at 1333 (providing that, before addressing the difficult Suspension Clause question, the Court "should first consider whether the petitioner can show actual innocence").